850 So.2d 259 (2002)
SERRA CHEVROLET, INC.
v.
EDWARDS CHEVROLET, INC.
General Motors Corporation
v.
Serra Chevrolet, Inc.
1010340 and 1010341.
Supreme Court of Alabama.
September 13, 2002.
Rehearing Denied December 20, 2002.
*261 Thomas E. Baddley and Jeffrey P. Mauro of Baddley & Mauro, L.L.C., Birmingham, for appellant/cross-appellee Serra Chevrolet, Inc.
Warren B. Lightfoot, Jere F. White, and Ivan B. Cooper of Lightfoot, Franklin & White, L.L.C., Birmingham; Charles L. Robinson of Johnston, Barton, Proctor & Powell, L.L.P., Birmingham; and Eileen Penner of Mayer, Brown, Rowe & Maw, Washington, D.C., for appellant General Motors Corporation.
John Martin Galese and Jeffrey L. Ingram of Galese & Ingram, P.C., Birmingham; and Jack E. Held and Anthony R. Smith of Sirote & Permutt, P.C., Birmingham, for appellee Edwards Chevrolet, Inc.
HARWOOD, Justice.
In these consolidated appeals, Serra Chevrolet, Inc. (hereinafter referred to as "Serra"), appeals from a summary judgment in favor of Edwards Chevrolet, Inc. (hereinafter referred to as "Edwards"); General Motors Corporation (hereinafter referred to as "GM") appeals from the trial court's denial of its motion for a judgment as a matter of law or, in the alternative, for a new trial following the trial court's entry of judgment on a $9,096,000 jury verdict and the trial court's award of $2,830,000 in attorney fees and expenses to Serra. We affirm as to Serra's appeal, and we reverse and remand as to GM's appeal.
On April 6, 1998, Serra sued Edwards, claiming that Edwards had tortiously interfered with its business relationship with GM.[1] On April 17, 1998, Edwards filed a motion to dismiss or, in the alternative, a motion for a more definite statement. On May 26, 1998, Edwards filed an answer to Serra's complaint. On June 4, 1998, Serra filed an amended complaint that set forth an additional claim that Edwards had acted in concert with other named defendants in violation of the Motor Vehicle Franchise Act (hereinafter referred to as "the MVFA"), § 8-20-1 et seq., Ala.Code 1975, "by engaging in a course of conduct which intentionally, willfully and maliciously attempted to harm [Serra] by denying it a full service dealership, and restricting the distribution of new motor vehicles to [Serra]." Serra's amended complaint also sought to name two GM "representatives," within the meaning of the MVFA, as defendants.
*262 On October 30, 1998, GM filed a motion to intervene as a defendant and filed an answer to Serra's complaint that also contained a counterclaim for a declaratory judgment.[2] On December 4, 1998, Serra filed materials in opposition to GM's motion to intervene and a motion to strike GM's answer. On December 8, 1998, the trial court granted GM's motion to intervene. On December 14, 1998, Serra amended its complaint to add GM as a defendant, claiming that GM had acted in concert with other named defendants in violation of the MVFA, and to state additional claims against GM alleging fraud, negligence, willfulness and wantonness, and negligent and wanton supervision. On May 3, 1999, GM filed an answer to Serra's amended complaint. On January 20, 2000, Edwards amended its answer to assert defenses of justification and competitor's privilege. On January 27, 2000, Serra filed a motion to strike Edwards's amended answer. The record contains no ruling on Serra's motion to strike.
On February 7, 2000, GM and Edwards filed separate motions for a summary judgment, with attached exhibits, as to all claims that Serra had asserted against them, respectively. On February 16, 2000, Serra filed oppositions to GM's and Edwards's motions for a summary judgment, with attached exhibits; Serra filed a supplement to its oppositions, with attached exhibits, on March 3, 2000. On May 25, 2000, GM filed a reply, with attached exhibits, to Serra's supplement. On June 7, 2000, the trial court entered an order on its case action summary; that order stated, in pertinent part:
"(4) All claims against General Motors, except for violation of the Motor Vehicle Franchise Act are due to be dismissed on Motion for Summary Judgment by defendant, General Motors, there being no genuine issue of material fact as to those claims and said defendant being entitled to judgment as a matter of law. Accordingly, all claims except for violation of the Alabama Motor Vehicle Franchise Act as against defendant, General Motors, are hereby dismissed."
(Emphasis original.)
Thereafter, sequentially, Serra filed a motion to alter, amend, or vacate the trial court's summary judgment for GM; Serra filed a memorandum in support of its motion, with attached exhibits; GM filed a response to Serra's postjudgment motion; Edwards filed a supplemental motion for a summary judgment with attached exhibits; Serra filed an opposition to Edwards's supplemental motion; and Edwards filed a response, with attached exhibits. While the trial court's June 7, 2000, order appeared to enter a summary judgment for GM as to all issues except Serra's claims that GM had violated the MVFA, the trial court entered another order on October 20, 2000, stating, in pertinent part:
"3. The Court further finds there is no genuine issue of material fact as to fraud claims stated by Plaintiff and against General Motors and that General Motors is entitled to summary judgment as a matter of law on those claims.

*263 Accordingly, judgment is due to and is hereby rendered in favor of Defendant, General Motors, as to all fraud claims."
The trial court certified the October 20, 2000, order as final pursuant to Rule 54(b), Ala. R. Civ. P.
On March 12, 2001, GM filed a motion for a final summary judgment on Serra's MVFA claims. GM's motion stated, in pertinent part:
"Serra's expert on the distribution issues has unequivocally testified that the problems he opines occurred with respect to Serra's vehicle distribution occurred in 1991 and Kevin Serra said he knew of his claimed distribution as far back as 1992. Serra's distribution claims are thus clearly barred by the four year statute of limitations contained in the Motor Vehicle Franchise Act (Ala. Code (1975) § 8-20-12) since this complaint was not filed against GM until December 10, 1998."
(Emphasis in original.) On that same day, Edwards filed a supplemental and renewed motion for a summary judgment. On March 20, 2001, Serra filed separate oppositions to GM's and Edwards's motions for a summary judgment. On March 21, 2001, GM filed a motion to dismiss Serra's MVFA claims "based upon Serra's spoilation [sic] of all of its distribution records." On that same day, GM filed an evidentiary supplement to its March 12, 2001, motion for a final summary judgment. On March 23, 2001, the trial court entered an order on the case action summary that stated, in pertinent part:
"(2) Summary Judgment is due to be and is hereby granted in favor of defendant, Edwards Chevrolet, and against plaintiff[;] accordingly, said defendant is hereby dismissed from this action.
"(3) General Motors' Motion for Summary Judgment is overruled as to damages and events occurring after December of 1994. Said motion is kept under advisement until trial as to pre-December of 1994 damages in the face of plaintiff's claim of discovery within the statute of limitations.
"(4) The question of attorneys' fees, expenses and costs by agreement is reserved, to be determined by the Court after trial in the event of a verdict in favor of plaintiff.
"(5) All other claims, cross claims, and third party claims except those previously dealt with, specifically dealt with herein, or set for trial, are hereby dismissed."
(Emphasis original.)
A jury trial on Serra's MVFA claims against GM began on April 2, 2001. On April 11, 2001, at the close of Serra's case-in-chief, GM filed a motion for a judgment as a matter of law, which the trial court denied. On April 13, 2001, the jury returned a verdict; that verdict stated:
"We, the jury, find in favor of the plaintiff, Serra Chevrolet, Inc., and against the defendant, General Motors Corporation, and assess damages in an amount of Nine Million, Ninety-Six Thousand Dollars ($9,096,000.00)."
The trial court entered a judgment on the jury's verdict on April 16, 2001. On May 11, 2001, Serra filed a petition seeking payment of attorney fees and expenses, with attached exhibits. On May 15, 2001, GM filed a renewed motion for a judgment as a matter of law or, in the alternative, a motion for a new trial or a motion for a remittitur. On May 30, 2001, GM filed an answer to Serra's petition for attorney fees and expenses, to which Serra filed a response on May 31, 2001. On June 14, 2001, GM filed a brief in support of its renewed motion for a judgment as a matter of law or, in the alternative, motion for *264 new trial.[3] On June 20, 2001, the trial court awarded Serra $2,500,000 in attorney fees and $330,000 in expenses.
On July 17, 2001, Edwards filed a motion seeking to have the summary judgment for it made final pursuant to Rule 54(b), Ala. R. Civ. P. On July 18, 2001, Serra filed an opposition to GM's renewed motion for a judgment as a matter of law or, in the alternative, motion for a new trial, to which GM filed a reply brief on August 1, 2001. Serra filed a response to GM's reply brief on August 3, 2001. On August 6, 2001, Serra and GM agreed to extend to September 12, 2001, the time in which the trial court could rule on all postjudgment motions. On August 21, 2001, Serra filed a motion for relief, grounded solely on Rule 60(a), Ala. R. Civ. P. ("Clerical Mistakes"), stating that the parties had not received notice of the trial court's March 23, 2001, order dismissing Edwards as a defendant and that they were unaware of it until August 2, 2001, and suggesting that the order "constitutes a clerical mistake which must be corrected." No attempt was made in the motion to reference or state any ground cognizable under Rule 60(b). On September 6, 2001, Serra and GM again agreed to extend the time in which the trial court could rule on all postjudgment motions; they agreed to extend the time to October 12, 2001. On September 24, 2001, Serra filed a response to Edwards's July 17 motion to have the summary judgment in its favor made final.
On September 25, 2001, the trial court entered an order denying GM's renewed motion for a judgment as a matter of law or, in the alternative, motion for a new trial; on that same day, it entered an order on the case action summary overruling Serra's Rule 60(a) motion for relief. Serra filed a notice of appeal to this Court on November 2, 2001, and GM filed a notice of appeal to this Court on November 5, 2001. This Court consolidated these appeals for review pursuant to Rule 3(b), Ala. R.App. P.

I. Serra's Appeal

In its notice of appeal from the trial court's summary judgment for Edwards, Serra lists the trial court's September 25, 2001, order overruling its Rule 60(a) motion as the order appealed from; in its brief to this Court, it sets out the following two issues:
"1. Whether Edwards Chevrolet made a sufficient showing that there [were] no genuine issues of material fact in that [Edwards] was entitled to summary judgment as a matter of law.
"2. Whether [Serra] presented sufficient evidence demonstrating that a genuine issue of material fact existed regarding Edwards Chevrolet's tortious interference with [Serra's] Satellite Agreement [by which Serra agreed to operate a satellite dealership in Gardendale] with [GM] and therefore caused GM to terminate the Satellite Agreement with [Serra]."
Our review of a summary judgment is de novo.
"In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the *265 burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
Further, this Court has stated:
"In determining the propriety of summary judgment, i.e., whether there exists any genuine issue of material fact, we are limited in our review to the same factors considered by the trial court when it initially ruled on the motion, Ex parte Bagby Elevator & Electric Co., Inc., 383 So.2d 173 (Ala.1980), and on such a motion the trial court can consider only the material which is before it at the time of submission of the motion. Stallings v. Angelica Uniform Co., 388 So.2d 942 (Ala.1980)."
Prudential Ins. Co. of America v. Coleman, 428 So.2d 593, 598 (Ala.1983)(emphasis added.) The trial court ruled on Edwards's motion for a summary judgment on March 23, 2001. Accordingly, in determining the propriety of the trial court's summary judgment for Edwards, we consider only the evidence and testimony of record as of that date; evidence and testimony placed in the record after this date, including that presented at trial, cannot be considered in this review. See Bean v. State Farm Fire & Cas. Co., 591 So.2d 17 (Ala.1991); Prudential Ins. Co. of America v. Coleman, supra.
"The elements of [a cause of action for tortious interference with a contract] are 1) the existence of a contract or business relation, 2) the defendant's knowledge of the contract or business relation, 3) intentional interference by the defendant with the contract or business, and 4) damage to the plaintiff as a result of the defendant's interference." Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238, 246-47 (Ala.1992)(citing Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296 (Ala. 1990)). In its brief to this Court, Edwards admits that the first two elements of a cause of action for tortious interference with a contract exist. However, Edwards argues that, at the time the trial court ruled on its motion for a summary judgment, Serra had offered only speculation as to Leon Edwards's alleged interference with Serra's contract with GM, that it had offered no evidence of damages, and that Serra's contract with GM in regard to its operation of a satellite sales facility in Gardendale had not been terminated.
In its reply brief to this Court, Serra states, in pertinent part:
"Edwards contends that even if the Plaintiff can demonstrate that Edwards tortiously interfered with its contractual relationship with GM, the Plaintiff has not suffered any damages. Edwards' Brief relies upon the fact that during discovery, the Plaintiff could not articulate any amount of damages caused by Edwards. However, during discovery, the Plaintiff's Satellite Agreement had not been terminated by GM. In fact, during this time, the Plaintiff's Satellite *266 dealership was conducting normal business operations. Accordingly, there was no reason for the Plaintiff's representatives to testify that Edwards' [tortious] conduct resulted in the termination of its Satellite dealership when said termination had not yet occurred.
"Additionally, Edwards argues that because the Plaintiff's satellite was open at the time the trial court entered summary judgment, the Plaintiff's claims relating to the termination of its satellite dealership are premature. However, such an argument misstates the record. The record reflects that the trial court entered a final summary judgment in favor of Edwards Chevrolet on September 25, 2001 (C. 2640). It is undisputed that GM's termination of the Plaintiff's Satellite Agreement was effective September 12, 2001. Accordingly, the Plaintiff's damages based upon the termination of its satellite dealership had accrued before the trial court entered a final judgment dismissing Edwards Chevrolet, and therefore the Plaintiff's damage claim was not premature."
The reference to page 2640 of the clerk's record is to an entry on the case action summary dated September 25, 2001. That case action summary stated:
"Serra Chevrolet, Inc. Rule 60 motion is heard, including rehearing on the original merits of the summary judgment. The merits of said motion remain such that even taking the evidence most favorably to Serra Chevrolet, Edwards Chevrolet remains entitled to judgment as a matter of law. In order that appeal times of all rulings made this day be simultaneous, Serra Chevrolet's motion is overruled."
By Serra's own account, it had not presented any evidence of damages nor had its contract with GM been terminated at the time the trial court ruled on Edwards's summary-judgment motion on March 23, 2001. Thus, Serra had presented no substantial evidence in support of its claim against Edwards of damages that would create a genuine issue of fact. Moreover, in regard to the first issue presented by Serra, we note that in Edwards's February 7, 2000, motion for a summary judgment, Edwards asserted that no Serra representative could state how Serra had been damaged and that Serra's claim was premature because Serra's contract with GM had not been terminated. Accordingly, we conclude that the trial court's summary judgment for Edwards is due to be affirmed.

II. GM's Appeal

In its appeal from the trial court's denial of its motion for a judgment as a matter of law or, in the alternative, motion for a new trial following the entry of the judgment on the jury verdict and the award of attorney fees and expenses, GM sets out the following seven issues in its brief to this Court:
"I. Whether Serra's claim for damages from the continuing effects of alleged misconduct, which it has repeatedly conceded began and ended well over four years prior to the date Serra filed suit, is time-barred under the MVFA, Ala. Code § 8-20-12 (2001).
"II. Whether Serra failed to present substantial evidence demonstrating that GM violated the MVFA.
"III. Whether both the fact and amount of Serra's purported `lost profits' were speculative and uncertain.
"IV. Whether the testimony of Serra's expert should have been excluded as too unreliable to assist the triers of fact.
"V. Whether the trial court erred in admitting irrelevant and highly prejudicial evidence of GM's prior dealings with Serra.

*267 "VI. Whether the trial court erred in instructing the jury that intent was irrelevant to a finding of liability under the MVFA.
"VII. Whether the trial court erred in awarding Serra statutory attorneys' fees of $2,500,000, even though Serra presented evidence that its actual reasonable fees, based on the number of hours its counsel worked multiplied by their normal hourly rates, were only about one-fifth of that sum$516,000; and whether the trial court erred in awarding Serra $330,000 in expert witness fees absent statutory authority for such an award."
This Court has stated:
"When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate issue is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). In an action filed after June 11, 1987, the nonmovant must present substantial evidence to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. If the question is one of law, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."
Ex parte Alfa Mut. Fire Ins. Co., 742 So.2d 1237, 1240 (Ala.1999).
A. The MVFA's Statute of Limitations

GM argues that Serra's claims against it under the MVFA are time-barred. Section 8-20-12, Ala.Code 1975, sets out the applicable limitations period for bringing a cause of action under the MVFA. That section provides:
"Except as otherwise provided in paragraph l. of subdivision (3) of Section 8-20-4, any civil action commenced under the provisions of this chapter must be brought within four years after the cause of action has accrued. The cause of action shall not accrue until the discovery by the aggrieved party of the fact or facts constituting a violation of the provisions of this chapter."
GM has maintained throughout this litigation that the limitations period in the MVFA barred Serra's claims against it. It asserted that defense in its answer to Serra's amended complaint, in its motion for a summary judgment, in its motion for a judgment as a matter of law, and in its postjudgment motions.
The trial court ruled on this issue as follows:
1. Before the testimony of Serra's expert witness, Dr. Michael Ileo, at trial, the following occurred:
"THE COURT: Let's talk about a couple of things. First, let's talk about statute of limitations.
"[GM's counsel]: All right, sir.
"THE COURT: Is Dr. Ileo coming next?
*268 "[Serra's counsel]: Yes, sir. He's my next witness.
"THE COURT: Let's talk first about statute of limitations. [GM] filed a motion for summary judgment as to the statute of limitations. At that time, the motion was deferred because plaintiff, the plaintiff alleged under [§ ] 8-20-12, [GM] filed a motion for summary judgment as to all claims arising before April 8, 1994, pursuant to the four-year statute of limitations in [§ ] 8-20-12. The plaintiff said that and argued ... [that] the discovery provision of that code section saved the expiration of that statute. At this point now that we're at this point in the plaintiff's case, and I take it that there have been no otherit doesn't particularly matter what the other testimony is. At this point, I have the testimony of Mr. Serra who has testified that he knew of the problem, thought his SOP [standard of participation] was too high all the way back in the '80s. Then in '87 to '88 he was complaining about his AGSSA [Area of Geographic Sales and Service Advantage]. In the early `90s he was complaining about his problem that up through 1993 he was involved in distribution `through my managers' in his words. He talked earlier about how he would check the order banks and they would be full. He did say that he talked to Glenn Curlette [a former GM account manager]. He said, Glenn, my inventory is poor. And he would say, quote, `your order banks are not full and you have not earned them.' He did not say necessarily that he had legally relied on it. In fact, the contrary implication exists, but the determinative testimony was given on that subject by Mr. Gary Murphy [a former Serra general manager] who testified in reference to Mr. Curlette. Glenn would say, you were getting what you earned. Mr. Murphy answered him in reference to his 1993 comments, `but I never believed him.'
"In short, the discovery ... provision of [§ ] 8-20-12 simply does not affect this case because Mr. Serra and his managers were aware of the facts that constituted the violation, and further they did nothing, even though they did not believe that. They affirmatively testified they did not believe [GM].
"So, the statute of limitations defense will be allowed as a matter of law. And I think rather than a judgment as a matter of law flowing to the jury there simply will be no charge to the jury except as to damages calculated after 1990, that date in 1994. And objection to any calculations prior to that date would be sustained."
2. At the close of Serra's case-in-chief the following occurred:
"[GM's counsel]: Your Honor, we are filing this motion for judgment as a matter of law....
"....
"[GM's counsel]: Your Honor, the undisputed evidence from the plaintiff is that the bad act or the wrongful act or the arbitrary act occurred in 1991. That act was the sole cause of the arbitrariness and the capriciousness or whatever the act uses as its standard.
"THE COURT: You're talking about the statute of limitations. You claim that the act in '91 causedwas the only thing that happened after that a stream of damage; is that correct?
"[GM's counsel]: That's correct. And the stream of damages, there is not any evidence of a series of additional bad acts that ... would support a claim for arbitrary distribution. All this case has been about is about what occurred in 1991. Now, this is not a continuing tort. It's a statutory action and there would *269 have to be some showing of an arbitrary distribution or some sort of basis for liability, not damage[s]. There is a claim for damage[s] but there is not a basis for liability after 1995 or in 1995 and after.
"In fact, the contrary is true. The plaintiff's own expert, Dr. Ileo, testified that GM complied with its own distribution practices and that it did nothing wrong in 1995 and '96 and '97 and '98 and throughin other words, Dr. Ileo
"....
"[GM's counsel]: Ileo was real clear that all of that occurred in 1991 and from thenceforth GM followed its distribution practices properly. That testimony alleviates any liability by GM after, in 1995 and after.
"....
"THE COURT: ... Your statute of limitations argument is a very good one, a very persuasive one and a very close one. And I have been attentive to that since that came up.
"I am charged by law, however, at this stage with construing the evidence and the like most favorable to the plaintiff to get past your motion. In the testimony of Dr. Ileo, at some point after Exhibit 1395 came in, in paraphrase he saidwell actually it was earlier than that but that is where I wrote it on my book.
"In paraphrase, though he saidhe essentially quoted it accurately that after the events of 1991 and thereabouts, [GM] followed its own plan. And there was later testimony today on that subject. But he also testified in paraphrase that [GM] could have fixed it at any time.
"In construing the statute, it would be the Court's ruling that your motion is due to be overruled because that could be the implementation on a month-by-month basis of a plan that was arbitrary or unreasonably discriminatory."
3. In its September 25, 2001, order ruling on GM's postjudgment motions the trial court stated, in pertinent part:
"One of the fairly debatable issues which requires in part an analysis of the Motor Vehicle Franchise Act (`MVFA'), Ala.Code § 8-20-1, et seq., is the statute of limitations argument. Plaintiff wanted to claim continuing tort and also avail itself of the `discovery rule' provision of § 8-20-12. It lost those arguments and the court granted judgment as a matter of law as to ALL claims regarding damages or conduct occurring more than 4 years before the suit was filed. Further, all other claims for damages were dismissed except for those arising under § 8-20-4(2) which proscribes defendant from engaging in `any action with respect to a franchise which is arbitrary, in bad faith or unconscionable,' and those arising under § 8-20-4(3)(a) which make it actionable for defendant to `adopt, change, establish, or implement a plan or system for the allocation and distribution of ... vehicles ... which is arbitrary, capricious, or unreasonably discriminatory.'
"Although the defendant continues to insist the ruling was that this was a `continuing tort' that was not and has never been the basis of the ruling. The defendant argues that Payton v. Monsanto, [801 So.2d 829, 835 (Ala.2001) ], and Moon v. Harco Drugs, 435 So.2d 218 (Ala.1983), determine the issue. Payton notes that `Alabama law does not recognize a continuing tort in instances where there has been a single act followed by multiple consequences.' Here, although GM undertakes to rely on a few out of context answers by one of Serra's witnesses, it was the conduct of GM each month during the period of *270 limitations which the court allowed the jury to consider. GM's own trial representative testified adversely that the method of allocation was applied (`implemented,' carried out, accomplished) each month and could have been altered at any time, and in fact was altered during the applicable time. At no time has Serra conceded otherwise. Further, GM claimed throughout that part of Serra's failure to receive vehicles was a result of its failure to keep its order bank full, yet the proof was that plaintiff's competitors frequently ordered no vehicles, but continued to receive ample allocation. On this subject, GM's representative, Mr. Barrick, testified that GM did not follow its own rules and procedures. In addition, plaintiff complained it was unreasonably discriminated against in GM's use of the `pref' and `pref guide' categories of the allocation system. The evidence was ample and virtually undisputed that these categories were administered arbitrarily and with wide discretion granted to GM's managers, unbeknownst to its dealers. The GM representative also testified the distribution manuals were not followed, or were wrong. In short, the testimony of GM's own company representatives, employees and retirees provided ample evidence to sustain a plaintiff's verdict.
"Defendant also relies on Moon, supra. That case discusses the discovery rule in tort. Unlike Moon, however, there is a statutory discovery rule which applies in this case. There is no need for further discussion of that issue inasmuch as GM won that argument at trial and the discovery rule was not allowed to extend the statute. Interestingly, Moon also holds `repeated wrongs to the plaintiff can constitute a "continuous tort" such as ... (2) when there is a "single sustained method pursued in executing one general scheme"' (at 220). The jury could have found this is what happened here.
"No claim accruing outside the limitation period was allowed to go to the jury. As to the actions within the period, the jury had ample evidence from GM's own people, as well as plaintiff's witnesses, that defendant's conduct, inter alia, in violating its own procedures, in implementing its allocation system, in its application of the pref/pref guide categories, in its use of the order banks or ignoring of same was arbitrary, capricious or unreasonably discriminatory."
Initially, we note that the trial court's ruling that Serra's cause of action accrued before April 8, 1994, has not been appealed to this Court. Further, this Court, when addressing the running of a limitations period when the occurrence of the injury, rather than the discovery of the injury, marked the accrual of a cause of action, has observed:
"In Garrett v. Raytheon Co., [368 So.2d 516 (Ala.1979)] the Court stated the principal rule of law thusly:
"`....
"`"We have held that the statute begins to run whether or not the full amount of damages is apparent at the time [the cause of action accrues]. In Kelly v. Shropshire, 199 Ala. 602, 75 So. 291, 292 (Ala.1917), the rule was stated as follows:
"`"If the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, be the actual damage (then apparent) however slight, and the statute will operate to bar a recovery not only for the present damages but for damages developing subsequently and not actionable at the time of the wrong *271 done; for in such a case the subsequent increase in the damages resulting gives no new cause of action...."'
"368 So.2d at 518-19."
Moon v. Harco Drugs, Inc., 435 So.2d 218, 220 (Ala.1983)(emphasis added). We conclude that this rationale applies here, where Serra did not appeal the trial court's ruling that the limitations period in the MVFA bars any claim by Serra based on acts by GM that occurred before April 8, 1994. Accordingly, claims for any damage sustained by Serra as a result of any violation of the MVFA by GM before April 8, 1994, and any subsequent damage resulting from such a pre-April 8 violation, would be barred by the MVFA's statute of limitations.[4] Thus, it is necessary that we consider whether there was sufficient evidence from which the jury could have reasonably inferred that GM violated the MVFA after April 8, 1994, i.e., within the limitations period.
B. Evidence of an MVFA Violation Within the Limitations Period
Serra's claims against GM are based upon alleged violations of §§ 8-20-4(2) and 8-20-4(3)(a). Those sections provide:
"Notwithstanding the terms, provisions, or conditions of any dealer agreement or franchise or the terms or provisions of any waiver, prior to the termination, cancellation, or nonrenewal of any dealer agreement or franchise, the following acts or conduct shall constitute unfair and deceptive trade practices:
"....
"(2) For any manufacturer, factory branch, factory representative, distributor, or wholesaler, distributor branch, distributor representative, or motor vehicle dealer to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties.
"(3) For any manufacturer, factory branch, factory representative, distributor, or wholesaler, distributor branch or distributor representative:
"a. To adopt, change, establish, or implement a plan or system for the allocation and distribution of new or used motor vehicles to motor vehicle dealers which is arbitrary, capricious, or unreasonably discriminatory or to modify an existing plan so as to cause the same to be arbitrary, capricious, or unreasonable discriminatory...."
*272 The gist of the testimony of Serra's expert witness, Dr. Michael Ileo, was that GM's vehicle allocation system, known as the "turn and earn" system,[5] resulted in a misallocation of vehicles between Serra and Edwards in 1991. During direct examination by Serra's counsel, Dr. Ileo testified, in pertinent part:
"Q. Let me ask you this right now, Dr. Ileo. Based on your years of involvement with the turn and earn system, do you have an opinion as to whether or not the turn and earn system conceptually is a fair system?
"A. Yes, it's a fair system.
"Q. And you have mentioned discretion several times. Is discretion an important component of that system?
"A. Yes.
"Q. Now, Doctor, based on all the information that's been produced in this case, irrespective of when it was produced, what, if anything, did you discover in your analysis of the 832 reports[[6]] in September of 1991?
"....
"A. During the summer and fall of 1991, a dramatic change occurred in the new vehicle distribution practices of [GM].
"Q. What change did you see as exhibited in the 832 reports?
"A. Despite the fact that Serra's sales were rising dramatically, GM lowered Serra's allocation and deliveries of new vehicles.
"Q. What, if anything, did you observe relative to Edwards Chevrolet as revealed by the 832 reports that have all been produced now?
"A. Despite the fact that Edwards's sales were declining, [GM] increased Edwards's new vehicle allocations and deliveries.
"....
"Q. And I would ask your opinion as to the increase in Edwards's sales in the '91, '92 period.
"....
"A. The rise in Edwards's sales follows a period of time in the summer and fall of 1991 when GM sharply changed its new vehicle distribution patterns with respect to what was then [termed] new Model Year N vehicles.[[7]] Those vehicles came out in the summer and fall of 1991, i.e., the new 1992 model years. In that period of time, [GM] delivered significantly more new Model Year N vehicles to Edwards and [a] relatively small number of new Model Year N vehicles *273 to Serra. As a result, Edwards's Model Year N sales rose radically while Serra's Model Year N sales essentially were flat.
"....
"Q. How can you account for the constant decrease in Serra's sales and the constant increase in Edwards's sales [from 1992 through 1995]?
"A. Edwards was earning more product and therefore was getting more product.
"Q. What, if any, effect did this event ... have on Edwards's earn as it built into the system?
"A. It was significant.
"....
"Q. Doc, the event that occurred in `91 that you've testified to, how did that relate to Edwards's earn at that time and to carry out to the future?
"A. Edwards got more vehicles that Serra didn't get. He got a lot more of them despite the fact that Serra was outselling Edwards significantly. When those vehicles hit the lot, it's a new model year, those vehicles are going to get sold. They get rolled into the turn and earn system. The turn and earn system works on a computerized basis. You sell, you earn. And as you sell more, you earn more. So, it feeds on itself internally. So, as long as you're turning the product, you are going to earn more, you are going to sell more, you are going to be allocated more.... It's a never-ending process. The only way that process can stop is for GM to exercise discretion, that is, the discretionary component of the distribution system as distinguished from the earn component.
"....
"Q. Now, Dr. Ileo, if I understand you correctly, once the additional allotment, however you want to characterize occurred in '91, is that effect still in Edwards's earn to this day?
"A. Yes.
"Q. And the lack of product which you've testified that Serra had orders in its order bank, did that have a negative impact to his earn which continues to this day?
"A. Yes.
"....
"Q. Dr. Ileo, in doing your analysis, explain to the Court and ladies and gentlemen of the jury how you reached the determination of whether or not Serra lost any cars and trucks by virtue of the allocation as [GM] actually did it in '91 through the years?
"A. I looked at the sales patterns by model over the 1989, 1990, 1991 period and reached an opinion as to the assessment as an opinion regarding the impact of Gardendale that was opened in June of 1989. All the data in the 832 reports of GM show that salesthat Serra's sales took off significantly. That trend continued through most of 1991 except for the last month or so. Had Serra continued to receive an allocation of vehicles beginning with Model Year N [1992], a portion [sic] to his sales performance, sales, Serra's sales would have continued to grow as a result of Gardendale. And I use that as the basis for determining sales that by model that Serra would have made had it received a supply of Model Year N vehicles that was proportioned to his Model Year N sales performance.
"....
"Q.... Now, Dr. Ileo, based on your analysis and research, what if any conclusions do you have regarding the allocation of motor vehicles relative to Serra and Edwards prior to 1991, prior to September of '91?

*274 "A. Edwards and Serra received an appropriate level and mix of new vehicle supplies from [GM].
"....
"Q. Did you reach an opinion regarding the allocation of [GM's] product, the actual allocation and deliveries relative to Serra and Edwards beginning in September of 1991?
"A. Yes.
"Q. And what is your opinion?
"A. At that point in time [GM] radically changed its new vehicle supply practices such that Serra was denied the level and mix of new vehicle supplies to which it was entitled and where Edwards received a level and mix of new vehicle supplies to which it was not entitled.
"....
"Q.... Now, once that event occurred that you have testified to, how is that accommodated within the turn and earn system throughout the years leading up to today?
"A. If a dealer does not have product, it does not make sales. If a dealer has an abundance of product, it makes an abundance of sales. Once those sales are made, they are rolled into the turn and earn system such that the dealer continually becomes entitled to an increasing amount of new product in the future.
"Q. And what is the effect of that event in '91 leading us up to today on Edwards's position in the marketplace and Serra's position in the marketplace in Birmingham, Alabama?
"A. Within 1991, the effect was comparatively small.
"Q. Yes, sir.
"A. But it started to build in 1992 and has built continually since that time. And today that preference that was built into the turn and earn system back in 1991 still resides in the number of vehicles being allocated to Serra and Edwards."
Dr. Ileo's ensuing damage calculations were also based upon the effect of the turn and earn system after the 1991 misallocation. In regard to the methodology of his damage calculation, he testified, in pertinent part, as follows:
"Q. Can you briefly describe to the ladies and gentlemen and the Court the methodology you used in doing your computation to determine whether or not Serra Chevrolet suffered damage as a result of the [1991] allocation that you have described?
"A. Yes. I examined the 832 report data for Serra and Edwards such as that we have previously discussed. I reached the conclusion as a result of Gardendale's opening in June of 1989, Serra's sales were increasing very rapidly. And, indeed, the 832 report data show a continuing upward movement in Serra's sales.
"At the same time, that 832 report data showed that roughly beginning in the summer of 1991, a sharp change occurred in the way GM allocated and delivered vehicles. That is, despite the fact that Serra's sales were growing very rapidly, GM cut Serra's allocation in delivery of new vehicles. Consequently, Serra's sales fell rather dramatically while Edwards's sales rose sharply.
"My damage calculation is based on the premise that had GM provided Serra with the same level of vehicles that was [commensurate] with the sales that Serra had been making such as it did with respect to Model Year L [1990], Model Year M [1991], Serra's sales would have continued to grow.

*275 "I projected that growth forward based on that prior experience, and I compared Serra's actual sales with ... the sales Serra would have made."
During cross-examination by GM's counsel, Dr. Ileo testified, in pertinent part:
"Q.... According to your model and your damage calculation, you have said that these misallocation problems with Serra were in 1991?
"A. Yes.
"Q. When in 1991?
"A. Again, in May of 1991.
"Q. And when did it end?
"A. It has never ended.
"Q.... You are saying that in 1991, [GM] did not follow its own distribution policy; is that what your contention is?
"A. That's correct.
"Q. And isn't it true that you also testified in your deposition that GM did follow its own distribution policies after that?
"A. That's correct.
"Q.... So, GM did follow its own distribution policies beginning in 1995 as far as you know?
"A. After the damage had been done, yes.
"Q. But you have no evidence that GM did not follow its own distribution policies in 1995, do you? And that's what you have testified
"A. That's correct.
"Q. And you have no evidence that GM didn't follow its own distribution policy in 1996, and that's what you have testified?
"A. Yes.
"Q. And you have no evidence that GM didn't follow its distribution policies in [1997]?
"A. Yes.
"Q. And you have no evidence that GM didn't follow its own distribution policies in '98 and '99 and 2000?
"A. Yes.
"....
"Q. Now, Dr. Ileo, you chose 1991 as a period for your baseline projection whereby you projected these millions of dollars in lost damages, did you not?
"A. I chose September and October of 1991.
"Q. I thought you told us you chose a six-month period in 1991 for the baseline projection for your damage calculation.
"A. I chose that period to determine the baseline projection, but the baseline projection was established as of October 1991.
"Q. All right, sir. Are you agreeing that it all happened in 1991?
"A. I am agreeing that the new vehicle supply problem began in 1991."
During redirect examination by Serra's counsel, Dr. Ileo further testified:
"Q. Now, [GM's counsel] asked you a series of questions about '92, '93, '94, so forth and so on. And you testified to the questionand I believe he asked you or asked in substancewhether or not you found any evidence of misallocation, that's my term, by [GM] relative to Serra in '92. '93, and he took you through each year. Do [you] recall that?
"A. Yes.
"....
"Q. And you recall your answer, what was it?
"A. I found no evidence of any maldistribution in the 832 reports for any of those years given the sales that were reported, the inventory that was reported in the 832 reports.

*276 "Q. You did find it in the summer and fall of '91?
"A. That's correct.
"Q. Now, once that base of earn was established prior to September or the summer of '91, you had no criticism of it?
"A. That's correct.
"Q. After the fall of '91, is it your testimony that Edwards's base was raised unfairly?
"A. Yes.
"Q. Once that earn was raised based on vehicles that he did not earn, wasn't entitled to, did that base continue on through the years?
"A. Yes.
"Q. And did the fact that Serra received less vehicles in the summer and fall of '91 than he had earned, that base continued lower than it should have?
"A. That's correct.
"Q. And it continued in '92, '93, on out until today?
"A. That's correct.
"....
"Q. Allocations in Model Year N, as in Nick, were greater for Edwards than Serra?
"A. About 60 cars, trucks and Geos, yes.
"Q. And once that happened, that was built into Edwards earned component of the system, of the computer?
"A. As long as Edwards sold them, yes.
"Q. And he gotthat built-in component that went out like an [inverted] pyramid today?
"A. That's correct."
Based on the foregoing testimony of Dr. Ileo, we conclude that there was no evidence presented to the jury indicating that GM failed to follow its distribution system after 1991, which the jury could have reasonably inferred to be a violation of the MVFA. As Dr. Ileo testified, the misallocation by GM between Serra and Edwards in the summer and fall of 1991 was a "radical" or "sharp" change in its distribution system that did not occur again. What did occur thereafter, however, were less sales by Serra, because of the lower allocation flowing from proper and objective application of the turn-and-earn program, due to the initial drop in 1991 of new vehicle allocation. That event occurred before April 8, 1994, and any damage sought by Serra based upon that event through the application of the turn-and-earn system are barred by the MVFA's statute of limitations. Moon, supra.
The record also contains evidence to support an inference that GM had failed to adhere strictly to policies stated in its distribution manual, which was provided to dealers, by providing vehicles to Edwards that Edwards had not ordered. On this point, Dr. Ileo testified, on direct examination by Serra's counsel, as follows:
"Q. Did you do an analysis of the 832 reports for Edwards in total to determine how many times something like this [receiving an allocation of vehicles that had not been ordered] happened?
"A. For the period September 1991 through I believe December 7, 1998, there were 192 instances wherethat is, 192 weeks where GM allocated vehicles, new Chevrolet vehicles, to Edwards while Edwards had placed no orders for such vehicle."
Thereafter, Serra introduced as a trial exhibit a compilation by Dr. Ileo of instances where Edwards had received vehicles in excess of the number it had ordered. A review of that exhibit, not taking into account any allocations of vehicles before April 8, 1994, and using the subtotals calculated *277 by Dr. Ileo, shows that during that periodApril 8, 1994, through October 19, 1998Edwards was allocated 210 vehicles from GM for which it had not placed orders.
Serra's counsel also questioned Henry Barrick, an administrative manager in GM's distribution department and GM's designated corporate representative, about numerous instances where the 832 reports showed that GM had allocated vehicles to Edwards that Edwards had not ordered. When questioned about the apparent inconsistency between this practice and the terms included in the distribution manual, Barrick stated that the manual was "not worded correctly."[8] The specific text of the distribution manual referred to by Serra to show the inconsistency appeared in a section captioned "`CPG' [Chevrolet Preference Guide] and Preferencable Orders." It stated, in pertinent part, that if a dealer entered "no orders" for vehicles with GM, then there would be "no orders preferenced," "no preference guide" (also referred to as "pref guide" in the 832 report, see footnote 6 to this opinion), and no carryover from one week to the next. Counsel for Serra questioned Barrick as to this aspect of the manual as follows:
"Q.... Now, to be certain we are all on the same page, [GM] tells its dealers if there are no orders that means zero in their totalwhat is it, total selectable order column?
"A. That is correct.
"Q. Then there are no orders preferenced, right?
"A. Right.
"Q. There's no orders are given, is that what
"A. You can't, yes. Can't do it.
"Q. Dealer missed out. And if that happens then there's no guide, that is, that column blank too?
"A. Which column is that?
"Q. Preference guide?
"A. No. Guide will haveit will still show the guide.
"Q. Well, that says no preference guide?
"A. Yeah, I'm not sure of the context in which it was written. I know I'm sitting here looking at it and the guide stays, okay. It's on all your 832 reports that you have. You'll see it. It's always stayed. I think what they're saying is no orders. We can't preference anything. You don't get any allocation.
"Q. Okay, so that is incorrect in the manual?
"A. It depends on what context you're looking at it, okay. If I was putting that in there I wouldn't say no guide, okay. You get the guide, but it doesn't mean anything."
Barrick also stated that when a dealer was due an allotment and had not ordered any vehicles, GM agents would often telephone other dealers in an effort to move its product.[9] Barrick further testified, in pertinent part, as follows:

*278 "Q. Now, here [Edwards] had ordered 9 and the system awarded him 23. Now, again, you're testifying that this figure had nothing to do with what was in the dealer order bank?
"A. The 23 has nothing to do with the order bank, no.
"Q. And he was given 20?
"A. Yes.
"Q. That he took even though he ordered nine; is that right?
"A. That is correct.
"Q. Would that be a phone call situation?
"A. I would have to assume that would be, yes.
"Q. That would be a phone call situation?
"A. Yes, we makeincidentally we make phone calls to an awful lot of dealers around the country. Serra has, I think, had their share of phone calls.
"Q. Yes, sir.
"A. So, we call a lot of dealers.
"Q. Mr. Barrick, I'm not implying that Serra did not receive preffed product, you know that?

"A. I just wanted to clear the air, that's all.
"....
"Q. Now, we have looked at vehicles that Edwards received. You also did a study to look and see what Serra received; is that correct?
"A. Yes, I did.
"Q. An do you recall analyzing those records and determin[ing] that Serra received 1,799 motor vehicles in addition to what he generated under the normal turn and earn?

"A. Yes, I did.
"Q. That's not unusual, is it?
"A. I don't know how to answer that. I don't do this that often, you know. And I can't really give you an honest response on that, you know. It can happen. It depends on what you're looking at, what size dealership it is.
"Q. Have you ever seen any other dealers receive over a period of time 1,800 more product?
"A. Oh, yes. Not the same size dealer."
(Emphasis added.) Thus, after Serra's counsel had set out the several instances in which Edwards had received additional vehicles, Barrick testified that after similarly conducting a study of Serra, he concluded that it had also received additional vehicles.
Although this, and other, evidence arguably could provide the basis for an inference that GM had an opportunity to favor one dealer, such as Edwards, over another, such as Serra, in providing a dealership with vehicles the dealership had not ordered, no specifics sufficient to support an award of compensatory damages were ever developed to show the actual impact of any truly discriminatory allocations as between Edwards and Serra. Moreover, and more importantly, Dr. Ileo's damage calculations, as explained by him, relied solely on *279 the allocation aberration that occurred in 1991 and the "extrapolated" subsequent fallout from that skewed allocation, because it served as base data in the otherwise objective and equitable turn-and-earn program. Thus, the $9,096,000 verdict cannot be upheld as attributable, in whole or part, to possibly discriminatory assignments to Edwards of vehicles not ordered by it. Based upon the evidence, limited to GM's conduct after April 8, 1994, we conclude there was no basis to support a verdict determining that GM's conduct was arbitrary, in bad faith, unconscionable, capricious, or unreasonably discriminatory, as is required for liability under the MVFA. Accordingly, because there was no evidence before the jury from which it could have reasonably inferred that GM violated the MVFA after April 8, 1994, GM was entitled to a judgment as a matter of law.
In summary, we conclude that the trial court's summary judgment for Edwards is due to be affirmed and that the judgment against GM is due to be reversed and the cause remanded for the trial court to proceed in a manner consistent with this opinion.
1010340AFFIRMED.
1010341REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
MOORE, C.J., and JOHNSTONE, J., concur in part and dissent in part.
MOORE, Chief Justice (concurring in part and dissenting in part).
I concur in the Court's conclusion that the summary judgment for Edwards Chevrolet is due to be affirmed. However, I must dissent from the Court's decision to reverse the judgment entered on the jury verdict against GM on the basis that GM is entitled to a judgment as a matter of law based upon the statute of limitations in the Motor Vehicle Franchise Act ("MVFA").
As the Court's opinion explains, the applicable limitations period for bringing a cause of action under the MVFA is found in § 8-20-12, Ala.Code.1975. That section states that a cause of action must be brought "within four years after the cause of action accrues. The cause of action shall not accrue until the discovery by the aggrieved party of the fact or facts constituting a violation of the provisions of this chapter." (Emphasis added.) Thus, even if the only violations of the MVFA committed by GM occurred in 1991, the central question concerning the statute of limitations in this case is when did Serra discover the facts constituting the violation?
In this case, Serra alleged that GM violated the MVFA by failing to provide Serra with the number of new vehicles for its inventory that it had earned based on Serra's monthly sales. Former GM account manager Glenn Curlette told Tony Serra, the president of Serra Chevrolet, in 1991 that Serra's order banks (the number of new vehicles a dealership orders based on inventory need) were not full and that the dealership was not selling enough vehicles to earn more new vehicles. The record reflects that Tony Serra regularly checked with his general manager to see if his order banks for new vehicles were full in order to verify Curlette's claim, but found each time that its sales were steady and its order banks were full. Mr. Serra never testified that he did not believe Curlette's statements about earning new inventory. In fact, Mr. Serra testified that he had "no way to judge how I was treated in my distribution [of vehicles]." In contrast to Mr. Serra's actual testimony in the record, the trial court recalled that Mr. Serra had testified that he did not believe Curlette's claims about new vehicle inventory.
*280 The trial court also recalled that former Serra Chevrolet general manager Gary Murphy had testified that he "never believed" Curlette when Curlette told him in a 1993 conversation that Serra was getting the inventory it earnedno more, no less. The trial court considered Murphy's statement "determinative testimony" that Serra Chevrolet knew about the MVFA violation before 1994.
However, the record reflects that what Murphy did not believe were Curlette's statements that he did not have anything to do with the allocation of vehicles to dealerships. In one portion of his testimony, commenting on his conversations with Curlette, Murphy stated: "He sometimes would say allocation is done by the allocation department. Well, I didn't really believe that, but that waswhen it got to that point, somebody else, Mr. Serra or somebody else, called and talked to the other departments." In another portion of his testimony, in answer to a question about whether Curlette ever claimed he had nothing to do with distribution, Murphy observed: "First of all, I never believed him [Curlette]. I always believed that he still had some kind of direct effect on what we got." Nowhere in Murphy's testimony did he state that he did not believe Curlette or anyone else at GM concerning the inventory reductions.
Yet, based on this erroneous recollection of testimony, the trial court concluded that "Mr. Serra and his managers were aware of the facts that constituted the violation.... They affirmatively testified they did not believe [GM]." Despite this claim, there is a very good reason why both Mr. Serra and Mr. Murphy could not be sure whether GM was telling them the truth about how much inventory Serra was entitled to based on sales: that information could be found only in what were called 832 reports, reports available only to GM, not to the dealerships.
There was repeated testimony, by witnesses called by both GM and Serra, that the 832 reports were the only documents that showed, according to GM's formula, how many vehicles Serra Chevrolet was entitled to receive based on its sales versus how many vehicles it actually received. Curlette, GM's district sales manager, testified that he knew of no way Serra could have known whether it was receiving what it had earned under GM's distribution formula and that the 832 reports were the sole source document that contained this information. GM's corporate representative, Bud Black, also testified that the 832 reports were the sole source of the necessary information and that the dealers did not have access to those reports. Likewise, Serra's damage expert, Dr. Ileo testified that without the 832 reports Serra never would have known if it had received its fair share of vehicles, and, moreover, that without the reports it could not have pinned down when any violations had occurred.
When all of this testimony is added to the fact that Curlette repeatedly kept telling Serra that it was receiving the number of vehicles it had earned, the unequivocal conclusion must be drawn from the evidence adduced at trial that Serra did not know in 1991 or even in 1994 about the violations committed by GM. The violations were discovered only by scrutinizing the 832 reports obtained in discovery after this action was filed.
The specific information provided in the 832 reports is key to the statute-of-limitations question in this case because § 8-20-12 stipulates that the cause of action accrues upon discovery of "the fact or facts constituting a violation." The violation of the MVFA in this case was GM's use of an arbitrary, capricious, and discriminatory *281 misallocation of new vehicles in contravention of GM's stated distribution system. In order for Serra to discover that there had been a misallocation, and that the misallocation was arbitrary, capricious, or discriminatory in comparison to its usual practice, Serra had to have access to the information that could be found only in the 832 reports. Thus, Serra could not have discovered the "facts constituting a violation" without the 832 reports. This means that the statute-of-limitations provision of the MVFA could not bar Serra's action.
GM argues that a finding that Serra could not have discovered the violations without the 832 reports, which were available upon discovery only after Serra filed its action, renders the statute-of-limitations provision of the MVFA moot. It argues that such a finding would, in effect, mean that Serra could have brought its action at any time. GM is correct; however, in this case I do not find such a result disturbing because of the unique factual situation. The 832 reports were the only documents that provided the information necessary to discover a violation of the MVFA. Those reports were never available to the dealers; GM alone had access to the inventory records. In such a situation, I do not see any way around finding that the violations were not discoverable until Serra had access to the records. The factual situation presented here is unique enough that I have no fear that a decision holding that the action is not barred by the statute-of-limitation provision of the MVFA would destroy statute-of-limitations provisions in general, or the provision of the MVFA in particular. However, because GM has put itself in this situation, its argument that a decision for Serra would render the statute of limitations moot does not operate to undo the MVFA.
The Court's opinion dismisses any quibbles over the trial court's determination of when Serra discovered the violations by noting that "Serra did not appeal the trial court's ruling that the limitations period in the MVFA bars any claim by Serra based on acts by GM that occurred before April 8, 1994." 850 So.2d at 271. It is true that Serra did not appeal that ruling, though it did object to it at trial and argues against it when answering the arguments GM advances in its brief on appeal. Yet, there is a very good reason Serra did not appeal the trial court's ruling: it prevailed on its claim against GM; thus, it was not permitted to appeal rulings pertaining to that claim.
"Alabama caselaw is clear that a party who prevailed in the trial court can appeal only on the issue of adequacy of damages awarded. DeBardeleben v. Tynes, 290 Ala. 263, 276 So.2d 126 (1973); Beatty v. McMillan, 226 Ala. 405, 147 So. 180 (1933); Nichols v. Perryman, 615 So.2d 636 (Ala.Civ.App. 1992); Cleveland v. Gilbert, 473 So.2d 1075 (Ala.Civ.App.1985)."
Ex parte Weyerhaeuser Co., 702 So.2d 1227, 1228 (Ala.1996). "However, that rule does not bar an argument that `amounts to a challenge to the adequacy of the jury verdict.'" Bergob v. Scrushy, [Ms. 2001252, Sept. 6, 2002] ___ So.2d ___, ___ (Ala.Civ.App.2002) (quoting Ex parte Vincent, 770 So.2d 92, 93 (Ala.1999)).
Appealing the trial court's ruling as to when Serra discovered the wrong committed by GM would not have amounted to a challenge to the adequacy of the jury's verdict. It is true that the trial court's ruling may have limited the amount the jury could award, but the ruling encompasses much more than that, as is clear from this Court's decision. The trial court ruled:
"So, the statute of limitations defense will be allowed as a matter of law. And I think rather than a judgment as a *282 matter of law flowing to the jury there simply will be no charge to the jury except as to damages calculated after 1990, that date in 1994. And objection to any calculations prior to that date would be sustained."
One clear implication of the Court's opinion is that this determination by the trial court was erroneous. The Court's opinion demonstrates that if it is assumed that Serra knew about the violations of the MVFA before 1994, then a ruling in favor of GM's statute-of-limitations defense bars Serra's entire claim against GM. But I cannot agree that Serra knew about or could have known about the violations in 1991 or 1994. Serra had to have access to the 832 reports to discover "the fact or facts constituting a violation of the provisions of [the MVFA]." § 8-20-12, Ala.Code 1975. Thus, contrary to the trial court's ruling on this issue, the determination as to when Serra discovered the violations affects Serra's entire claim against GM, not just the amount of damages recoverable. Consequently, Alabama law explicitly forbade Serra from appealing that issue directly. Instead, it had to respond to GM's arguments on appeal of the issue in its appellee's brief, as it did.
At trial, Serra objected to the trial court's ruling on this issue by arguing that the question of when Serra knew of the violations is a factual question properly left to the jury.
"When a claim accrues, for statute-of-limitations purposes, is a question of law if the facts are undisputed and the evidence warrants but one conclusion. However, when a disputed issue of fact is raised, the determination of the date of accrual of a cause of action for statute-of-limitations purposes is a question of fact to be submitted to and decided by a jury."

Kindred v. Burlington Northern R.R., 742 So.2d 155, 157 (Ala.1999) (emphasis added; citations omitted). In this case, I believe the facts are clear that Serra did not know about the violations before the time-bar of the statute of limitations, but the facts in the record present a genuine issue of material fact as to when Serra did know of the violations. The question should have been submitted to the jury. In fact, because the trial court did not completely bar Serra's claim against GM, I believe the trial court, in effect, did submit the issue to the jury. The jury obviously did not believe that Serra knew about the violations by 1994, as is evidenced by its verdict.
Regardless whether the trial court submitted the statute-of-limitations question to the jury, the bottom line in this case is that the trial court made its ruling on the discovery issue based on its erroneous recollection of trial testimony; it is clear from the record that Serra could not have known about the violations committed by GM at the time the trial court said that it knew about them, and Serra did everything within its power to protest the trial court's ruling on this issue. Given all of this, I am of the opinion that the jury verdict should not be overturned on the basis of the statute-of-limitations defense.
I am mindful of the fact that in arriving at this conclusion, I am in essence saying that the verdict was correct despite the trial court's error in its ruling on the statute-of-limitations issue. But because "`we can affirm a judgment if we disagree with the reasoning of the trial court in entering the judgment, as long as the judgment itself is proper,'" Progressive Specialty Ins. Co. v. Hammonds, 551 So.2d 333, 337 (Ala.1989) (quoting Smith v. Equifax Services, Inc., 537 So.2d 463, 465 (Ala.1988)), such a result is the correct result. I must therefore dissent from the Court's reversal *283 of the judgment entered on the jury verdict.
JOHNSTONE, J., concurs.
NOTES
[1] Serra also named Leon Edwards (Edwards's president); the National Automobile Dealers Association ("NADA"); and other fictitiously named parties as defendants. Leon Edwards and the NADA are not parties to this appeal; other defendants, also not pertinent to this appeal, were subsequently named in this action. Hereinafter we will refer only to the parties and filings pertinent to these appeals.
[2] GM's counterclaim for a declaratory judgment sought, in part, to have the trial court declare that a "letter agreement" between GM and Serra in regard to Serra's operation of a Chevrolet satellite sales facility in Gardendale was to terminate by its own terms on October 31, 1998. GM filed a motion for a summary judgment on its counterclaim for a declaratory judgment on February 7, 2000; that motion was granted by the trial court on October 20, 2000. On November 28, 2000, Serra filed a notice of appeal to this Court based upon the trial court's October 20, 2000, order. This Court affirmed the trial court's judgment, without an opinion. Serra Chevrolet v. General Motors Corp., 824 So.2d 86 (Ala.2001)(table).
[3] GM made no mention in this brief of its previous alternative motion for a remittitur.
[4] We acknowledge the general rule, pointed out in the Chief Justice's special writing concurring in part and dissenting in part, that a party who prevails in the trial court can appeal only the adequacy of damages. DeBardeleben v. Tynes, 290 Ala. 263, 276 So.2d 126 (1973). However, such an appeal would have been appropriate for Serra under the circumstances of this case because it would have directly challenged the trial court's ruling that excluded any evidence of damages relating to claims that occurred before April 8, 1994. The trial judge in this case did not apply the statute of limitations as a complete bar to the clause under the MVFA, but rather as a bar to all damages accrued outside of the four-year period immediately preceding the filing of the action. See Ex parte Vincent, 770 So.2d 92 (Ala.2000)(holding that a plaintiff who prevailed at trial could appeal the trial court's exclusion of evidence that could have affected the amount of damages that the jury awarded); Hicks v. Westbrook, 537 So.2d 482, 483 (Ala.Civ.App.1987), reversed in part on other grounds, 537 So.2d 486 (Ala.1988)(holding that an appellate court will consider an argument alleging evidentiary error at trial when it amounts to a challenge to the adequacy of the jury verdict). See also Hicks v. Dunn, 819 So.2d 22 (Ala.2001)(holding that the plaintiffs, who prevailed on their claim of negligence, and were awarded compensatory damages, could appeal the trial court's judgment as a matter of law eliminating their wantonness claim because that claim could have allowed a recovery of punitive damages).
[5] As explained by various testimony elicited from several different witnesses, under the "turn and earn" system, the number of a specific vehicle model, e.g., Camaro, Corsica, Corvette, Suburban, etc., a dealer was allocated by GM corresponded to the number of that particular model that the dealer had previously sold.
[6] An "832 report" is an internal GM document, issued weekly and not available to dealers, used for vehicle allocation purposes. Three categories of information contained in the 832 reports were heavily relied on in this case: (1) "pref guide"the number of vehicles a dealer was entitled to receive pursuant to the turn and earn system; (2) "total selectable orders"the number of vehicles the dealer had requested; and (3) "preference" the number of vehicles GM actually allocated to the dealer.
[7] GM assigned an alphabetical designation to its vehicles' different model years. Dr. Ileo explained these designations as follows:

"Q. Now, we have talked about model years, and just very briefly again remind us what Model Year L means, what M means and what N means.
"A. 1990 Model Year L was introduced in 1989. 1991 Model Year M was introduced in, again, the summer or fall of 1990. And 1992 Model Year N was introduced in the summer or fall of 1991."
[8] There were two distribution manuals referred to at trialone issued in 1988 and a second in 1993. Several portions of the 1988 manual were offered by Serra's counsel and admitted into evidence. Although Barrick's testimony that the wording of the manual was incorrect referred to the 1988 manual, he testified that the 1993 contained very few, if any, changes. Those changes were never identified, but they were apparently not pertinent to the issues in this case, because both sides treated the sections from the 1988 manual as applicable to the case.
[9] Barrick used the term "open allocation" to describe the process in which GM would provide vehicles to dealers in this manner. Barrick testified, in pertinent part, as follows:

"Q. All right. Is it your testimony that [GM] never uses its discretion for any reason in allocating vehicles to dealers?
"A. Well, we use discretion on open allocation, that is, allocation that dealers do not want. And they tell us they don't want it by not putting orders in or they tell their area sales managers I do not want this allocation. That's the discretion that we use.
"Q. No other discretion?
"A. Well, as far as the allocation of product, the system allocatesthe system generates an allocation to every dealer nationally, all right. If the dealer elects not to take the allocation, they don't give us an order or if they have an order they say take it away, I don't want it. That's when we have discretionary or if you would like to call it discretionary, that's when we have to use our discretion of where to put that additional product."