Walter J. Price, Jr., the defendant in this legal-malpractice action, appeals a judgment entered against him in the Madison Circuit Court; Edward Roland Ragland and the other plaintiffs in that action cross-appeal. We reverse and remand in the appeals (cases no. 1040251 and no. 1040265), and we dismiss the cross-appeals (cases no. 1040314 and no. 1040336).
 FACTS AND PROCEDURAL HISTORY
The claims against Price arose after Turner Beverage Company ("TBC"), a closely held corporation that operated a beer-distribution business, redeemed a substantial percentage of its stock in 1986. T.O. Turner, Jr. ("Tully"), was a proprietor of the business before it was incorporated in 1978. Price, Tully's lawyer and a friend of the Turner family, performed the legal services to incorporate the business. TBC issued 5,000 shares of stock at the time of its incorporation; Tully, the president of TBC, received 3,300 of those shares, and his mother, Ruby Turner, held the remaining 1,700.
In 1981 Price assisted Ruby Turner with her estate planning. In order to minimize potential estate taxes, Ruby Turner transferred her 1,700 shares of TBC stock for the benefit of Tully's four children — Gordon Sims ("Buddy"), Laura, Gregory, and Sue Jennie. Buddy was Tully's oldest son and worked in the family business; Ruby Turner transferred 612 shares of her TBC stock to Buddy in 1981. The balance of her TBC stock — 1,088 shares — was transferred to the Second T.O. Turner, Jr. Children's Trust, a trust of which Tully's children, excepting Buddy, i.e., Laura, Gregory, and Sue Jennie, were the beneficiaries ("the children's trust"). Those beneficiaries were not active in the operation of TBC. Ruby Turner appointed Tully as the trustee of the children's trust.[1]
Tully suffered a brain aneurism in 1983. Immediately before undergoing surgery, Tully signed a durable power of attorney that gave Buddy — then an officer of TBC — the authority to handle Tully's business and personal affairs until he recovered. Following the brain surgery, however, Tully had two massive strokes, was severely incapacitated, and was unable to work or handle any of his personal affairs for the remainder of his life. After the strokes, a substantial and steady income source was needed to pay for Tully's medical and personal-care expenses.
By 1986 Buddy had replaced Tully as the president of TBC. Buddy consulted Price and Robert Bibb, TBC's outside accountant, about potential methods to generate the significant income needed for Tully's care without incurring adverse tax consequences. Buddy accepted a recommendation from Price and Bibb that TBC redeem a large percentage of its outstanding shares of stock in order to generate income for Tully and his children; in exchange for the stock, TBC would execute unsecured promissory notes payable in installments to Tully and the children's trust. *Page 249 
Because TBC stock was not publicly traded, a valuation of the outstanding shares was necessary before the stock redemption occurred. The accounting firm of Coopers Lybrand was retained to perform that valuation. Based on information it received from TBC, Coopers Lybrand prepared a draft report in July 1986 in which it estimated the value of TBC stock as $496 per share. Assuming a $500 value for each share, the following transactions occurred in 1986:
 1. TBC purchased all of Tully's 3,300 shares. In that transaction, Buddy acted in his capacities as the attorney-in-fact for Tully (the transferor) and as the president of TBC (the transferee). As consideration for Tully's shares, TBC executed a promissory note in which it agreed to pay Tully the principal amount of $1.65 million plus interest calculated at a rate of 7.75% annually, in 300 equal monthly installments; and
 2. TBC purchased the 1,088 shares of TBC stock held in the children's trust. Buddy, acting in his capacity as attorney-in-fact for Tully — the original trustee of the children's trust — purportedly effected this transaction on behalf of the children's trust. As consideration for this purchase, TBC executed a promissory note in which it agreed to pay the children's trust the principal sum of $544,000, plus interest at a rate of 7.75% annually in 300 equal monthly installments.
(Both transactions are referred to hereinafter collectively as "the stock redemption.") Because Buddy did not sell his 612 shares to TBC in 1986, he was the sole shareholder of TBC after the stock redemption.
Price prepared certain documents to effect the stock redemption, and he represented the interests of TBC and Tully in that transaction.[2] There is no evidence indicating that, before the stock redemption was completed, Price, Buddy, or any other party involved in that transaction sought approval or otherwise consulted with the beneficiaries of the children's trust (i.e., Buddy's siblings) concerning the redemption by TBC of the 1,088 shares owned by that trust.
Tully died testate in 1991. His will designated Edward Roland Ragland (Tully's brother-in-law) and Myra S. Turner (Tully's wife) as coexecutors of his estate ("the estate"). Two trusts were created by Tully's will: (1) a marital trust for Myra; and (2) a family trust in which Tully's four children (Buddy, Laura, Gregory, and Sue Jennie) were the beneficiaries ("the family trust"). Ragland retained Price to provide legal services in connection with the probate of the estate.
After the estate filed its federal tax return, the Internal Revenue Service ("the IRS") in 1994 contested the valuation of the TBC stock at $500 per share used for the stock redemption. The IRS preliminarily determined that the value of the TBC stock was $1,422 per share when Tully sold his 3,300 shares to TBC. The IRS contended that the difference between the $500 value used in the stock redemption and the actual value of the stock constituted a gift by Tully of approximately $3 million, thereby resulting in additional estate-tax liability exceeding $1 million.
After the IRS dispute arose, Ragland met with Buddy in August 1994 and notified him that, because TBC had assigned the $500 value to the stock in 1986, his expectation was that the corporation was responsible for the financial consequence to the estate of any undervaluation of the *Page 250 
stock. Ragland also asked Price (the lawyer for the estate) to challenge the IRS's determination and to help resolve the IRS dispute. Price then took several steps to protect the interests of the estate. First, he associated an attorney with expertise in handling similar disputes with the IRS. Second, Price contacted Coopers Lybrand, which had valued the stock in 1986 at $496 per share, to retain their firm's services. Price later secured the services of another accountant who opined that, in 1986, the value of the TBC stock was $451 per share. Price also worked closely with Bibb (TBC's outside accountant) on matters related to the IRS dispute.
Price sent numerous letters concerning the IRS dispute to members of the Turner family. On November 22, 1994, Price wrote a letter addressed to the coexecutors, "Mr. Gordon Sims Turner, President, Turner Beverage Company," and "Mr. Gordon Sims Turner, Trustee of T.O. Turner, Jr. Second Children's Trust" to advise those parties as to the status of the dispute; in that letter, he noted that the coexecutors of the estate and the trustee of the children's trust owed fiduciary duties to their respective devisees and beneficiaries. In pertinent part, that letter stated:
 "The purpose of this letter is to set forth, in writing, the course of action to be taken regarding the [IRS dispute] which has arisen as a result of the audit of the Estate Tax Return. . . . As you are aware, the basic issue . . . is the valuation of the stock which represent[ed] a principal asset in the [estate] and also [was] the corpus of the [children's trust]. This valuation made in 1986 was done for the purpose of assuring the fairest and most equitable distribution in favor of [Tully] and his family and a reevaluation of that stock would result in substantial complications in addition to increased estate taxes.
 "As you are probably aware, the executors [of Tully's estate] and the trustee [of the children's trust] owe a fiduciary duty to their devisees and beneficiaries. This fiduciary duty is at least twofold; it at least requires an ultimately full disclosure to the devisees and beneficiaries of what has happened with regard to the share valuation
[of the stock redeemed by TBC] and the effect on the estates and their expectancies. Additionally, if the stock purchase of 1986 is revalued as to share value, the executors and trustees owe the duty to their devisees and beneficiaries to seek and require an adjustment of the value of the trust and the estate by seeking and obtaining an amount equal to the difference in the share value of the valuations. Since the stock [transferred in the stock redemption] is now held as treasury stock by [TBC], the trustee and the executors must look to the corporation for increased capital in accordance with the resulting valuation, or face personal liability in the event of a claim made by the devisees or beneficiaries.
 ". . . .
 "The central issue is the valuation of the stock in [TBC] owned by [Tully] on July 22, 1986 and the value of the shares of stock held by the [children's trust] at approximately the same time. As you are aware, Coopers Lybrand's valuation at that time, though apparently only in draft form, was $496.00 a share. . . . Mr. Gary Saliba, [an accountant Price consulted], has presented a valuation, again at this time in draft, which shows the stock to have been worth $451.00 a share [in 1986]. The IRS draft, as prepared by the IRS engineer, arrived at a valuation of $1,422.00 per share. It is this divergence of valuations resulting from what we believe to be an unreasonable *Page 251 valuation by the IRS that necessitates this letter and the action steps set forth in it. . . .
 "By way of conclusion, let us reiterate what has been said on several occasions and that is that we believe the IRS valuation to be clearly erroneous and clearly excessive. We believe that ample evidence exists to sustain our position as to the excessiveness and we believe that the estate, and therefore the corporation, should ultimately be successful in [contesting the IRS valuation]."
(Emphasis supplied.)[3]
In a March 27, 1995, memorandum to his file and to Bibb, Price described his strategy for settling the IRS dispute:
 "If we [negotiate a settlement with the IRS based on $550 a share], we would succeed in two ways:
 "1. The ultimate additional [estate] tax would be . . . approximately $70,000. This is an amount equal to or less than the legal fees involved in pursuing the matter to court;
 "2. Additionally, [an] agreed-upon share value [of $550] then would be no more than 10% [greater] than the Coopers [ Lybrand] share value and the action we took based upon it at the time of the acquisition of Tully's shares. A 10% variance in value is certainly within acceptable limits and therefore the children of [Tully] should have no cause of action against Buddy as president [of TBC], or against Buddy as attorney-in-fact nor against [TBC] for the valuation and purchase. Nor should anyone have any particular grounds for objecting to the personal representatives [of the estate] having compromised the matter at such a price."
(Emphasis supplied.)
In 1995 Ragland, one of the coexecutors of the estate, asked Price whether a variation between the valuation of the stock used for the stock redemption and the subsequent IRS valuation would give rise to a claim by the estate and the beneficiaries of the children's trust against Buddy.[4] Price answered that question affirmatively and gave the following legal advice in a confidential legal memorandum to Ragland dated April 11, 1995:
 "Under Alabama law, it is clear that a discrepancy between [the] sales price and an ultimate valuation of stock will not ordinarily give rise to a cause of action. This is particularly true where there is an arm's-length negotiation between the parties and free access to the information upon which to base a valuation of the stock. However, this [is] not true in the instant case, where the primary beneficiary of the bargain, [Buddy], was the attorney in fact for the seller. . . . Unlike an arm's-length transaction, the buyer/seller cannot argue that [the stock redemption] was freely bargained for and thereby shield himself from liability. A purchase of stock at a price that is later determined to be inadequate, when sold by the attorney-in-fact for the seller, would therefore appear to be voidable.
 ". . . . *Page 252 
 "There are other considerations beyond whether there was a breach of fiduciary duty [by Buddy acting in the capacity of attorney-in-fact for the sellers in the stock redemption]. A cause of action could also arise for fraud or misrepresentation under Ala. Code [1975,] § 6-5-101. . . . In the instant case, where the facts upon which the valuation was made were provided by the person who benefitted most by the sale of the stock, and the stock was closely-held and without a ready market upon which to base an opinion, [a] statement of an opinion on valuation would probably be considered actionable if relied upon. In addition, the fact that the independent appraisal of the value of [TBC] could not be certified [by Coopers Lybrand] primarily due to an unwillingness [of TBC management] to disclose information needed to properly appraise the company is also a factor to consider in making a determination as to whether a cause of action for fraud existed.
 "CONCLUSION: Should the stock be determined by the IRS and the Court to have been sold at an inadequate price, both the estate and the beneficiaries of the children's trust would have a cause of action for breach of fiduciary duty and a cause of action for fraud."
(Emphasis supplied.) In the cover letter that accompanied the memorandum, Price further advised Ragland:
 "The nature of the resulting causes of action for `breach of fiduciary responsibility' and `fraud' are the types of assertions which, when made, make the accused very defensive and generally uncooperative. We, therefore, will leave to your discretion how and when, and, indeed, if the contents of this memorandum will ever be acted upon."
Recognizing that a legal action against TBC was not in the estate's interest during the pendency of the IRS dispute, Ragland instructed Price to cooperate with Buddy and TBC to resolve that dispute on terms acceptable to the estate and TBC. In that spirit, TBC agreed to pay the legal fees that Price and counsel he associated incurred in connection with the IRS dispute.
Shortly after Price's April 1995 confidential memorandum to Ragland, Price further advised other interested parties of developments in the dispute. In a May 1, 1995, letter addressed to Buddy as the trustee of the children's trust, Price stated that the IRS was willing to settle in the range of $663 a share, but suggested that $550 per share was more appropriate. After the IRS rejected the estate's settlement offers, in May 1995 it sent the estate its formal notice of tax deficiency. In a May 31, 1995, letter addressed to Buddy as president of TBC, Price detailed the adverse consequences to TBC and Buddy personally if the IRS prevailed:
 "If the facts and figures as submitted by Coopers Lybrand are correct, or even reasonably close to correct, then there is no immediate consequence to you personally and slight consequence to the corporation. If on the other hand, the IRS' [valuation of the stock at $1422 per share] is to be accepted and sustained, then that presents a substantial problem to perhaps both you and the corporation.
 ". . . If the IRS' position [that the stock was undervalued in July 1986] is to be accepted, then a gift [of over $3 million] was made to you to the detriment of the estate of your father and perhaps to your mother and your brothers and sisters. If the same valuation is used [for the transfer of TBC stock by the children's trust], then it could be *Page 253 contended that your brother and sisters, [the beneficiaries of the children's trust], were perhaps directly mistreated in the position of the trust stock.
 "These are of course serious sounding things and they could have some serious results. We all know that at the time of the transfers in 1986 reliance was made upon the work of independent experts and every effort was made by all concerned to make that a true valuation with a resulting `arms' length transaction. Nevertheless, the action taken by the IRS in [its] valuation, which we believe erroneous to the point of being ridiculous, does present some possible unpleasant contingencies for the company and for you individually. Both Ed Ragland and I thought . . . that we should reiterate some of the unpleasant potential consequences which might occur should the IRS [position] be sustained. . . ."
(Emphasis supplied.)
On September 28, 1995, Price further advised in a letter to Buddy in his capacity as president of TBC:
 "Previously, [Coopers Lybrand has] raised questions to me about the existence of a conflict of interest that could be said to have existed when you, as attorney-in-fact for your father on one hand, and the President of the corporation and sole surviving shareholder on the other hand, arranged the evaluation to achieve the [stock redemption]. . . . [E]veryone knew that something had to be done, certainly in Tully's case, but there still exists the apparent conflict. A similar, but in [Coopers Lybrand's view] a more persuasive conflict, existed in the purchase of the shares of the [children's trust] of which you were the Trustee. These were the principal reasons that . . . [Coopers Lybrand] never . . . issued a final report.
 ". . . [Coopers Lybrand was also concerned in 1986] that the cash flow and profit figures [of TBC] were lower than with other distributorships with like volume. [Coopers Lybrand was] interested to learn whether or not money was being used for the acquisitions of non-corporate property of a real and/or personal nature. . . . [Because you did not provide Coopers Lybrand the data it requested, that firm] terminated [its engagement] without a final signed report being submitted."
Although Price advised and communicated with multiple parties to the IRS dispute whose interests were conflicting, he did not disclose to the coexecutors, TBC, Buddy in his individual capacity, Buddy as the purported trustee of the children's trust, or the beneficiaries of the children's trust that he was representing parties with conflicting interests, nor did he obtain waivers of any conflicts from those parties.
Price ceased working on the IRS dispute and left the practice of law in the spring of 1996. The total legal fees earned by Price in his years of work on the IRS dispute were no more than $27,000. After Price's withdrawal, Ragland retained new counsel for the estate in the spring of 1996; he then also advised the beneficiaries of the children's trust (his nieces and nephews) about the pendency of the IRS dispute.
The IRS dispute was settled in September 1996. At that time, the estate agreed to pay federal taxes calculated on the assumption that Tully's stock was worth $665 per share when TBC purchased his 3,300 shares in July 1986 ("the IRS settlement"). The beneficiaries of the children's trust did not participate in the negotiations that led to that settlement. By entering into the settlement, the estate incurred additional tax liability of approximately $210,000, and lost $76,000 of its unified credit. *Page 254 
Shortly after the IRS settlement in 1996, the estate and the children's trust filed two separate actions that were related to the stock redemption. On November 12, 1996, the coexecutors and devisees of the estate (hereinafter collectively "the estate claimants") sued Buddy, TBC, Bibb, Bibb Associates (Bibb's accounting firm), and Price (case no. CV-96-1959). Among other allegations related to the transfer of Tully's 3,300 shares to TBC and the alleged undervaluation of those shares, the estate claimants alleged that Buddy was not authorized under the power of attorney to transfer those shares in 1986; that Price knew that Buddy lacked authority to effect the stock redemption but concealed that fact; that Buddy breached his obligations under the power of attorney given him by Tully to act in his father's best interests; that both Price and Bibb breached their respective professional responsibilities by representing and performing services for parties with conflicting interests without disclosing those conflicts; that Bibb had valued the stock based on inaccurate information and had prepared deficient estate-tax returns; that the defendants breached their fiduciary duties by self-dealing; and that all the defendants "joined together, planned and conspired" to commit a conversion (of the TBC stock) and fraud upon the estate claimants to place exclusive control of TBC in Buddy's hands, to conceal the true value of the stock that was redeemed, and to convert the stock at an undervalued price. The estate claimants sought the following relief in their complaint:[5] a judgment declaring void the transfer of Tully's 3,300 shares to TBC and the rescission of that transfer, restoration of ownership of Tully's 3,300 shares to the estate, and reimbursement of the estate claimants for their pro rata shares of dividends and other distributions by TBC between 1986 and 1996. They asserted the following claims: a conspiracy claim against all defendants; against Buddy, claims of breach of contract, fraud, breach of fiduciary duties, and conversion; against TBC, claims of conversion and breach of contract and the imposition of a constructive trust, related to TBC's obligations under the promissory notes delivered to the claimants in 1986; against Price, fraud, negligence, and wantonness in failing to disclose that he represented parties with conflicting interests between 1986 and November 1996 and that Buddy was without legal authority to complete the stock redemption; and against Bibb and his firm, negligence and wantonness in Bibb's work for the estate and on the valuation of the stock.
Two days later, on November 14, 1996, the trustee of the children's trust and its three beneficiaries (hereinafter collectively "the trust claimants") filed another complaint against the same defendants (case no. CV-96-1972).[6] Although the factual allegations in the second action related to the transfer of 1,088 shares of TBC stock held by the children's trust to TBC in 1986, not the transfer of Tully's 3,300 shares, the claims and legal theories advanced by the trust claimants in the November 14, 1996, complaint — declaratory judgment, rescission, conspiracy, fraud, breach of fiduciary duty, professional negligence — were strikingly similar to those *Page 255 
asserted by the estate claimants. The trust claimants specifically alleged in their complaint that Price knew, but concealed, that the power of attorney given by Tully (the trustee of the children's trust) to Buddy did not authorize Buddy to transact business for the children's trust or to transfer its shares in 1986. The trust claimants also alleged that Price should have advised them that, after Tully became incapacitated, they had a right under the trust instrument to the designation of an independent successor trustee.
The trial court consolidated the two actions. Following extensive discovery, in April 2001 the estate claimants and the trust claimants (hereinafter collectively "the plaintiffs") entered into a comprehensive agreement to settle their claims against Buddy and TBC ("the settlement"). The settlement preserved the right of the plaintiffs to maintain their claims against Price.[7] The components of the settlement were as follows:
 1. The plaintiffs relinquished their ownership claims in the stock TBC redeemed in 1986, and dismissed their requests to rescind or declare the stock redemption invalid. In so settling these claims, the plaintiffs waived any equity interest in TBC and recognized that Buddy was the sole shareholder of TBC;
 2. The plaintiffs relinquished their claims to any pro rata share of any dividends, salary, distribution, or other payment by TBC after 1986 for the benefit of Buddy or its other officers and managers;
 3. (a) TBC and Buddy paid the trust claimants $2 million and (b) TBC executed a new secured promissory note in their favor for the principal sum of $2,098,916, plus interest. The principal amount of this settlement note, plus $289,649 in interest, was paid in full by 2004;[8]
 4. TBC executed a new secured promissory note in favor of the estate claimants for the principal sum of $1,887,184, plus interest. The principal amount of this settlement note, plus $260,430 in interest, was paid in full by 2004;[9] and
 5. Buddy relinquished any rights he might have had as a beneficiary of his father's estate. In waiving these rights, an estimated $1.45 million benefit accrued to the estate (whose beneficiaries were his siblings and mother).
The undisputed evidence at trial was that the total financial value to the plaintiffs of the settlement approximated $6 million.[10]
After the settlement, the plaintiffs amended their complaints to acknowledge the resolution of their claims as to Buddy and TBC. In those amendments, they alleged that Price, acting alone as an attorney and in combination with the former defendants in the case, had inflicted harm, but that they had not recovered damages *Page 256 
for that harm in the settlement. In addition to the damages previously sought from Price in their complaints, they further alleged in the amendments that had Price disclosed his conflicts at the outset of the IRS dispute and advised his clients of legal options other than contesting the IRS dispute, (1) the legal actions would not have been filed, (2) they would not have incurred attorney fees and litigation expenses in prosecuting their legal actions, and (3) at the time of the settlement, they would have received more consideration from the settling defendants if those parties had not incurred their own litigation expenses in defending the actions between November 1996 and 2001 (damages sought based on items 2 and 3 are hereinafter referred to as "the litigation damages").
The claims against Price were tried to a jury in May 2004.[11] Evidence was presented indicating that Price was engaged to perform legal services on two matters that affected the plaintiffs: (1) the stock redemption; and (2) the IRS dispute. Mark Hoffman, the plaintiffs' expert on the standard of care for lawyers engaged in professional conduct, testified that at the time of the stock redemption Tully, TBC, and the children's trust had conflicting financial interests and that Price represented all those parties.[12]
The plaintiffs also presented evidence indicating that they had conflicting interests in 1994 when the IRS dispute arose.[13] After Ragland retained Price to represent the estate in the IRS dispute, Price also advised Buddy individually, TBC (through Buddy, its president), and Buddy as the purported trustee of the children's trust, on developments, strategies, and the potential liabilities of the parties to each other related to the IRS dispute.[14] Hoffman testified that before representing clients with conflicting interests in the IRS dispute, Price should have disclosed those conflicting interests to his clients and obtained from them waivers of any conflict. If those waivers were not secured, Hoffman testified, Price should have withdrawn from representing any of those parties. Because Price failed to disclose his conflicts and to obtain waivers in his work on the stock redemption and the IRS dispute, Hoffman concluded, Price breached the standard of care for a lawyer. According to Hoffman, the conflicts that marred *Page 257 
Price's work on the stock redemption continued during the IRS dispute.
Furthermore, the plaintiffs presented substantial evidence indicating that, while the IRS dispute was pending, Price advised them that their most prudent course was to contest the valuation of TBC stock assigned by the IRS. According to Hoffman, Price committed legal malpractice because he did not counsel the plaintiffs on other options — particularly the right to seek rescission of the stock redemption — that were then available to resolve the IRS dispute.
Finally, the plaintiffs also presented evidence indicating that Price's dealings in which Buddy was acting in the capacity of the trustee of the children's trust fell below the standard of care for a lawyer. Hoffman testified that, in those dealings, Price was aware that a legal issue existed as to whether Buddy, in his capacity as the attorney-in-fact for Tully, had authority to act on behalf of the children's trust and was also aware that Buddy had not been duly appointed as successor trustee for that trust. According to the plaintiffs, Price had superior knowledge of those issues and concealed them in order to protect the interests of his favored clients, TBC and Buddy.
The plaintiffs claimed damages based on two types of injury. First, they presented evidence indicating that Price's legal malpractice had caused them to lose control of their interests in TBC; as a result, they argue, they did not receive their respective shares of corporate dividends, profits, and distributions and lost the right to control its management ("the loss-of-control damages"). TBC paid no dividends before the stock redemption; between 1988-1996, Buddy, then the sole shareholder of TBC, received approximately $5 million in dividends. In the years immediately preceding the filing of these actions, TBC paid Buddy dividends of $574,209 in 1994, $971,967 in 1995, and $1,162,470 in 1996. The plaintiffs also showed that, during 1982-1985, Tully's annual compensation as president of TBC averaged approximately $195,000; on average, Buddy's annual salary as president of TBC between 1986 and 1996 was approximately $275,000. In the years immediately preceding these actions, Buddy's annual salary as president was $325,000 in 1994, $300,000 in 1995, and $350,000 in 1996. According to the plaintiffs, had they not lost control of their interests in TBC because of Price's malpractice, they would have received 88% (their collective ownership interest in the stock of TBC before the stock redemption) of all distributions (including dividends and alleged excessive salary payments) by TBC.
Second, Hoffman testified that had Price fully advised the plaintiffs of the benefits of rescinding the stock redemption rather than contesting (and ultimately settling) the IRS dispute, a different course of events would have occurred. According to the plaintiffs, had they fully understood the rescission option when the IRS dispute arose, the stock-valuation dispute and related disputes among members of the Turner family could have been more fairly and justly resolved, and the plaintiffs could have avoided the protracted litigation and resulting litigation damages that followed the settlement ("the different-course damages").
On May 28, 2004, the jury returned a verdict for the plaintiffs on their legal-malpractice claims against Price and awarded the plaintiffs $400,000 compensatory damages and $700,000 punitive damages. Price filed motions in the trial court for a judgment as a matter of law ("JML"), or, in the alternative, a new trial.
The trial court subsequently conducted a hearing to consider the appropriateness of *Page 258 
the punitive-damages award in view of the factors articulated by this Court in Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby,539 So.2d 218 (Ala. 1989). Finding the punitive-damages award of $700,000 excessive because of Price's dire financial condition, the trial court conditionally denied Price's motion for a new trial if the plaintiffs remitted that entire award.[15] The plaintiffs elected the remittitur.
On November 12, 2004, Price appealed the adverse judgment entered by the trial court on the jury's $400,000 compensatory-damages award. On November 23, 2004, the plaintiffs cross-appealed the trial court's remittitur order.[16] For the reasons discussed below, we reverse the judgment against Price because his posttrial motion for a JML was meritorious.
 ANALYSIS Standard of Review
The following standard applies in reviewing the trial court's denial of Price's motion for a JML:
 "When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. . . . Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. . . . The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. . . . A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. . . . In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. . . . Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling."
Waddell Reed, Inc. v. United Investors Life Ins.Co., 875 So.2d 1143, 1152 (Ala. 2003).
 Nature of Claims
Price was a licensed attorney at all times pertinent to the plaintiffs' claims. Although the plaintiffs asserted claims of conspiracy, fraud, negligence, and wantonness *Page 259 
against Price, all actions against him — or any licensed attorney — that arise in whole or part from the performance of legal services are governed by the Legal Services Liability Act.[17] See §§ 6-5-572(1) and 6-5-574, Ala. Code 1975.
A two-year limitations period applies in legal-service-liability actions. § 6-5-574, Ala. Code 1975. This Court held in Michael v. Beasley, 583 So.2d 245
(Ala. 1991), that the limitations period begins to run when the claimant sustains an injury. 583 So.2d at 251-52. The "injury principle" from Michael applies here.[18]
 Issues
Price does not contest the jury's determination that he breached the standard of care for professional conduct by a lawyer. Instead, according to Price, the plaintiffs may not recover for two principal reasons: (1) their claims were time-barred; or (2) even if their claims were timely, the plaintiffs did not present substantial evidence indicating that they incurred damages within the two-year period preceding litigation ("the statutory period") that resulted from malpractice by Price that was actionable. The plaintiffs do not dispute that their recovery for compensatory damages is limited to damages within the statutory period. However, they argue that they presented substantial evidence from which the jury could have found that Price's malpractice caused them $400,000 compensatory damages during that period.
As noted above, Price performed legal services on two distinct matters: (1) the stock redemption in 1986, and (2) the IRS dispute in the 1990s.[19] According to Hoffman, Price first breached the standard of care when working on the stock redemption, and he continued to breach that standard during the pendency of the IRS dispute. In evaluating this evidence of malpractice on both engagements, we first note that § 6-5-574 states in pertinent part that "in no event may [a legal-service-liability] action be commenced more than four years after [the] act or omission or failure giving rise to" the claim. Accordingly, any claims based on damage caused by Price's service on the stock redemption in 1986 were time-barred by November 1996 (the month the actions were filed) pursuant to the four-year limitation in § 6-5-574.
The statute-of-limitations issue and the issues of damages and proof here are similar to those considered in SerraChevrolet, Inc. v. Edwards Chevrolet, Inc., 850 So.2d 259
(Ala. 2002). In Serra the plaintiff, a dealer in new motor vehicles, alleged that General Motors Corporation ("GM") had violated Alabama's Motor Vehicle Franchise Act ("the MVFA") by favoring another *Page 260 
Birmingham-area dealer when GM distributed new vehicles. A four-year statute of limitations applies to claims under the MVFA. § 8-20-12, Ala. Code 1975. The alleged wrongful allocation occurred in 1991; according to the testimony of plaintiff's expert, damage continuously resulted from that wrongful act in 1991 until the plaintiff filed its action on April 8, 1998. 850 So.2d at 275. There was no evidence indicating that GM had improperly distributed new vehicles to its dealers in the four years that preceded the filing of the action. Considering what damages could be recovered under those facts in view of the four-year limitations period in the MVFA, this Court stated:
 "`In Garrett v. Raytheon Co., [368 So.2d 516
(Ala. 1979),] the Court stated the principal rule of law thusly:
 "`". . . .
 "`"`We have held that the statute begins to run whether or not the full amount of damages is apparent at the time [the cause of action accrues]. In Kelly v. Shropshire, 199 Ala. 602, 75 So. 291, 292 (Ala. 1917), the rule was stated as follows:
 "`"`If the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, be the actual damage (then apparent) however slight, and the statute will operate to bar a recovery not only for the present damages but for damages developing subsequently and not actionable at the time of the wrong done; for in such a case the subsequent increase in the damages resulting gives no new cause of action. . . .'"
 "`368 So.2d at 518-19.'
 "Moon v. Harco Drugs, Inc., 435 So.2d 218, 220 (Ala. 1983) (emphasis added).
 We conclude that this rationale applies here, where Serra did not appeal the trial court's ruling that the limitations period in the MVFA bars any claim by Serra based on acts by GM that occurred before April 8, 1994. Accordingly, claims for any damage sustained by Serra as a result of any violation of the MVFA by GM before April 8, 1994, and any subsequent damage resulting from such a pre-April 8 violation, would be barred by the MVFA's statute of limitations."
850 So.2d at 270-71. The plaintiffs proof in Serra
that damage was first sustained in 1991 and continued into the four-year period before the action was filed was insufficient to support the jury's award of compensatory damages.850 So.2d at 278-79. Accordingly, the Serra Court reversed a judgment for the plaintiff because of the absence of evidence of events occurring in the applicable statutory period from which the jury could have reasonably inferred that GM had violated the MVFA.
Considering Price's work over a 10-year period and his statute-of-limitations defense, and applying the principles inMichael and Serra, we conclude that the jury's compensatory-damages award is sustainable (1) if the plaintiffs filed their actions within two years after they initially incurred damages from Price's malpractice on the IRS dispute, and (2) if, as a result of that malpractice, they incurred damages within that period. See Michael,583 So.2d at 251; Ladner v. Inge, 603 So.2d 1012, 1015
(Ala. 1992) (limitations period for legal-service-liability action caused by use of unsecured promissory notes ran from date of the first injury, which was the date of the delivery of those notes); and Serra, 850 So.2d at 278-79. Drawing all reasonable inferences the jury could have drawn in favor of the plaintiffs, we now consider Price's statute-of-limitations argument *Page 261 
and whether there was substantial evidence on which the jury could have based its $400,000 compensatory-damages award.
A. Timeliness of Complaints
Price argues this Court should reverse the judgment because, if the plaintiffs sustained any injury, that injury was sustained before the statutory period. The IRS dispute arose by March 1994. Ragland advised Buddy in August 1994 that the estate intended to hold TBC responsible for any financial loss caused by the stock valuation in 1986. Hoffman testified that when Price began his work on the IRS dispute, Price was representing parties who had conflicting financial interests; according to Hoffman, those conflicts existed during Price's service on the stock redemption and continued into 1994. Price argues that the plaintiffs' actions filed in November 1996 were untimely because, he says, he represented parties with conflicting interests no later than August 1994 — more than two years before the actions were filed. We conclude that the actions were not time-barred.
Although Price performed services on the IRS dispute before the statutory period, there was substantial evidence from which the jury could have inferred that, under the plaintiffs' theory, their first injury from Price's malpractice in relation to the IRS dispute occurred within the statutory period. Price initially represented the estate in the IRS dispute. Thereafter, he complied with Ragland's instructions to consult representatives of TBC on matters of mutual interest to the estate and TBC. Most significantly, however, the record indicates that, in Price's November 22, 1994, correspondence, he advised the estate, TBC, and the children's trust (through Buddy, whom Price was treating as trustee) about their respective obligations concerning the IRS dispute. In that letter he also first suggested a strategy that all parties contest the position taken by the IRS in that stock-valuation dispute.[20] Under the plaintiffs' theory, their actions were not facially time-barred because the jury could have found that the plaintiffs first suffered injury in relation to the IRS dispute as a result of the advice Price rendered on November 22, 1994 — a point within the statutory period.
B. Proof of Damages
We next consider whether the plaintiffs presented substantial evidence of damages. As discussed above, that evidence falls into two categories: (1) loss-of-control damages and (2) different-course damages.
1. Loss-of-control damages
In considering loss-of-control damages, we recognize that, among other remedies, the plaintiffs sought to invalidate or rescind the stock redemption when they sued in 1996. Had Tully not transferred his 3,300 shares to TBC in 1986 or had that transfer been invalidated, he (and later his estate) would have remained the majority shareholder in TBC. Further, the children's trust, which before the stock redemption owned more shares of TBC stock than Buddy, would have exercised a substantial role in the management of TBC had the transfer of its 1,088 shares not occurred or had that transaction been rescinded.
According to Hoffman's testimony and documentary evidence, had Price's malpractice not caused the plaintiffs to surrender their TBC stock, they would have received 88% (their aggregate ownership interests in the stock of TBC before the *Page 262 
stock redemption) of all distributions by TBC during the statutory period. Assuming the plaintiffs owned the controlling shareholder interests they held before the stock redemption, their pro rata shares of the dividends paid to Buddy within the statutory period ($574,209 in 1994, $971,967 in 1995, and $1,162,470 in 1996) well exceeded, and alone constituted substantial evidence of, the $400,000 compensatory-damages award. The plaintiffs also proved that the salaries paid to Buddy as the president of TBC during the statutory period ($325,000 in 1994, $300,000 in 1995, and $350,000 in 1996) exceeded those paid to Tully before the stock redemption.[21]
Further, it is undisputed that the plaintiffs could have managed TBC, steered its corporate direction, and enjoyed other benefits of ownership had they continued to control TBC after 1986.
However, the plaintiffs initially lost control of TBC when the corporation redeemed its stock in 1986.[22] Evidence that damage continued within the statutory period from a wrong that first caused injury outside that period will not support an award of compensatory damages based on that wrong. SeeSerra, 850 So.2d at 270-71, 278-79. Although the plaintiffs proved that they incurred loss-of-control damage within the statutory period, their claim based on that damage was untimely under § 6-5-574, Ala. Code 1975, because it was not proximately related to any injury within the statutory period that resulted from Price's malpractice in his work on the IRS dispute.
2. Different-course damages
The plaintiffs presented substantial evidence indicating that, during the statutory period, Price's service on the IRS dispute fell below the professional standard of care for a lawyer in three respects: (i) he failed to disclose that he was simultaneously representing parties whose interests were conflicting; (ii) he knew, but failed to disclose to the parties he was representing, that Buddy lacked authority to complete the stock redemption on behalf of the children's trust; and (iii) he advised his clients to contest the IRS's stock valuation but did not fully advise them about other options that were available when the IRS dispute arose in 1994. Particularly, the plaintiffs proved that Price was derelict in his duty to advise his clients of their option to seek to rescind the stock redemption. According to the plaintiffs, Price's malpractice forced them on the following course to protect their interests: (a) settling the IRS dispute in September 1996; (b) suing all the defendants in November 1996; and (c) finally, settling their claims against TBC and Buddy in 2001. Hoffman opined that, had Price fully disclosed his conflicts and his clients' options when the IRS dispute arose in 1994, events could have transpired differently. With those disclosures, the plaintiffs assert that the stock-valuation dispute could have been settled earlier on more just, fair, and less acrimonious terms, and that the litigation and resulting litigation damage would have been avoided.
The plaintiffs' claims for different-course damages relate to Price's work on the IRS dispute; accordingly, the recovery of damages for that harm is not time-barred because, if proven by substantial evidence, the harm occurred within the statutory *Page 263 
period. For the following reasons, however, we find that the plaintiffs did not satisfy that burden.
First, the plaintiffs alleged, but did not prove, what "different course" would have been taken had Price made full disclosures and provided impartial advice to them in 1994. There is no probative evidence indicating that the plaintiffs would have pursued the rescission option and not followed the chosen course if they had been fully apprised of that option in 1994 when the IRS dispute arose. Indeed, Price advised Ragland in April 1995 that the estate might have the right to rescind the stock redemption, but the estate did not then pursue that remedy.[23] Had the estate elected the rescission option in 1994, the following consequences would have followed:
 1. The estate would have been obligated to return approximately $1.5 million in consideration that TBC had paid to it and Tully for his stock between 1986-1996;
 2. The estate would have incurred federal estate tax liability based on the inclusion of the total
value of Tully's 3,300 shares in his estate at his death in 1991, not merely the difference between the assumed $500 per share value and $665 valuation used to settle the IRS dispute. There is no evidence in the record indicating the value of Tully's shares at the estate valuation date in 1991; and
 3. The income tax treatment for Tully (and the estate) for payments received from TBC in the years preceding the rescission would have been revisited.
Further, Ragland testified that the estate's acceptance of the IRS's position in the valuation dispute would have bankrupted the estate. Instead of agreeing to pay taxes based on a substantially higher valuation of TBC stock or rescinding the stock redemption in 1994, the estate cooperated with TBC and Buddy, contested the stock-valuation dispute, and settled that dispute on the assumption that, albeit undervalued, the transfer of Tully's 3,300 shares to TBC in 1986 was valid.
Moreover, there is no substantial evidence indicating that the children's trust would not have followed the course it followed if, in 1994, Price had advised that trust of its right to claim rescission.[24] Had an independent trustee of the children's trust evaluated the rescission option in 1994, an analysis of multiple factors would have been necessary before the trust elected to rescind the transfer of its 1,088 shares to TBC. First, that trust would have been obligated to return approximately $350,000 paid by TBC in consideration for those shares from 1986-1996. Further, the beneficiaries of the children's trust were also the beneficiaries of the *Page 264 
family trust that was one of the devisees of Tully's will. If both the children's trust and the estate had rescinded the stock redemption in 1994, the benefit to the beneficiaries of the trust from rescission would, to an extent not quantified in the record, have been mitigated because the value of the estate would have been reduced by the estate's increased tax liability and its refund of the consideration that the estate and Tully received from TBC for Tully's 3,300 shares.
Moreover, even after the plaintiffs asserted their rescission claims in 1996, they relinquished them in 2001 and ratified the stock redemption in the settlement of their claims against TBC and Buddy. Considering all these circumstances, we conclude that the plaintiffs did not prove, and it is speculative to assume, that they would have embarked on a "different course" had Price fully disclosed his conflicts and their legal options when the IRS dispute arose in 1994.
Additionally, even assuming that Price's malpractice on the IRS dispute caused the plaintiffs to pursue an imprudent course, their different-course damages were not quantified. Hoffman testified as follows on cross-examination at trial:
 "Q: But as you sit here today, you're not prepared to share with us any kind of analysis that you've done to be able to tell these ladies and gentlemen, boy, if they'd undone that [stock-redemption] transaction here's how all that would have come out. You haven't done that work?
 "A: No, I haven't. I can tell you for a fact though that the beneficiaries, other than Buddy Turner, because of their interests in the trust and being the only beneficiaries of the [children's] trust, and their three-quarter interest as residual beneficiaries in the estate would have come out much better had [the stock redemption] been undone. I can't say as to what the effect of Mr. Buddy Turner would have been.
 "Q: Okay. And you haven't —
 "A: But I can't map that out for you dollar for dollar.
 ". . . .
 "Q: But you haven't taken all this information [about corporate distributions] and done the kind of analysis that we just talked about in terms of being able to tell us specifically what the economic consequences or damages would have been had the [stock-redemption] transaction been undone?
 "A: With absolute specifics? No sir, I have not."
On redirect examination by plaintiffs' counsel, Hoffman further testified:
 "Q: [Price's counsel] showed you these distributions from [TBC]. You don't have to do a lot of calculation. But if this stock transaction was nullified from `94 through `96, we know [the plaintiffs] had 88 percent of the stock, don't we?
 "A: The combination of the estate and the trust, that's correct.
 "Q: So you could just calculate 88 percent of these numbers [on distributions] in here and calculate what the estate and the trust lost by not having this stock back there, can't you?
 "A: That's correct. That's very simple math. That's not complicated."
Considering this testimony, the plaintiffs did not attempt to calculate the financial consequences of a "different course" had Price made full disclosures in 1994. Instead, their proof focused on the distributions they did not receive as a result of selling their shares in 1986 and losing control of TBC — a claim that is time-barred for the reasons stated above. Under these *Page 265 
circumstances, the plaintiffs did not prove their different-course damages by substantial evidence.[25]
 CONCLUSION
The plaintiffs presented probative evidence at trial indicating that Price committed legal malpractice in his work on the IRS dispute. They did not, however, prove by substantial evidence that they were injured during the statutory period as a proximate result of that malpractice. Although the loss-of-control damages in the statutory period exceeded the $400,000 amount in compensatory damages awarded by the jury, the recovery of the compensatory damages was time-barred by §6-5-574 because they resulted and continued from a wrong (i.e., Price's work on the stock redemption) that first caused injury outside the statutory period. Moreover, although the different-course damages claimed by the plaintiffs related to the IRS dispute and the actions based on it were not time-barred under the plaintiffs' theories, their proof of those damages was deficient and speculative.
Because the plaintiffs did not present substantial evidence indicating that Price's breach of his professional duty in his legal service on the IRS dispute caused them injury, their malpractice claims fail because they did not prove an essential element of their action — damages. Accordingly, the judgment against Price is reversed and the cases are remanded for proceedings consistent with this opinion. In view of our holding, we do not consider the plaintiffs' cross-appeals concerning the remittitur of punitive damages. See AlabamaPattern Jury Instructions: Civil 11.03 (award of compensatory or nominal damages is a prerequisite to the recovery of punitive damages). The cross-appeals are therefore dismissed as moot.[26]
1040251 and 1040265 — REVERSED AND REMANDED.
1040314 and 1040336 — APPEALS DISMISSED.
LYONS, WOODALL, STUART, SMITH, PARKER, and MURDOCK, JJ., concur.
COBB, C.J., and SEE, J., concur in the result.
[1] If Tully resigned as trustee or died and failed to designate a successor trustee, the trust instrument stated that Price could become the successor trustee.
[2] At the jury trial of the legal-malpractice claim against Price, the evidence was disputed as to whether Price also represented the children's trust in the stock redemption.
[3] Price had also written Buddy about the children's trust on June 7, 1994. That correspondence stated that Buddy had undertaken to act as trustee of the children's trust pursuant to the power of attorney from Tully, the original trustee; it also noted that the trust instrument required a writing to nominate a successor trustee and that such an instrument did not exist.
[4] Buddy acted as the president of TBC and the attorney-in-fact for Tully, and he purported to act as trustee of the children's trust when TBC redeemed its stock in 1986.
[5] The estate claimants in the November 12, 1996, action (CV-96-1959) were the coexecutors; Ragland and Myra Turner, as trustees of the marital trust; Ragland and Myra Turner, as trustees of the family trust; and Myra Turner, individually.
[6] The trust claimants were Donald Weir, as the trustee for the children's trust, and Buddy's siblings — Laura, Gregory, and Sue Jennie. Cecil Bishop was the trustee at the time of trial.
[7] The claims against Bibb and Bibb Associates were settled by a separate agreement.
[8] This promissory note replaced the $544,000 unsecured promissory note given to the children's trust at the time of the stock redemption in 1986. The total principal and interest payments made to the trust claimants between 1986 and 1996 on that initial note was $353,549.
[9] This settlement note replaced the $1.65 million unsecured promissory note given to Tully at the time of the stock redemption in 1986. The total principal and interest payments made to Tully, and then to his estate following his death, between 1986 and 1996 on that initial note was $1,579,926.
[10] Price presented evidence at trial that, excluding the approximately $2 million in payments received on the initial promissory notes, the total value that the plaintiffs received in the settlement and other payments made by TBC on their behalf approximated $8 million.
[11] Buddy's three siblings, the beneficiaries of the children's trust, dismissed their individual claims against Price before trial.
[12] In 1986 Price did not disclose to Tully, TBC, the beneficiaries of the children's trust, or Buddy that he was representing parties with conflicting financial interests or obtain waivers of any conflicts from those parties.
[13] During the pendency of the IRS dispute, the interests of TBC, Buddy, and the estate were to some extent aligned; that is, a settlement with the IRS in which the valuation of TBC stock was close as possible to the $500 value used in the stock redemption would mitigate the estate's obligation to pay taxes and the potential liabilities of Buddy and TBC arising from the 1986 transactions. However, a higher valuation of the stock was advantageous to the devisees of the estate in other regards and generally would benefit the beneficiaries of the children's trust.
[14] Evidence of Price's representation of multiple parties included his November 22, 1994, correspondence to the coexecutors, TBC, and Buddy, as the purported trustee of the children's trust, in which Price noted the fiduciary duties the coexecutors owed the devisees of the estate and the trustee owed the beneficiaries of the children's trust; his April 1995 confidential memorandum to Ragland detailing Buddy's potential liabilities to the estate and the children's trust; and his May 31, 1995, letter to Buddy and TBC describing the "potential unpleasant consequences" of claims by the estate and the children's trust if the IRS prevailed in the stock-valuation dispute.
[15] Evidence was presented at the Hammond hearing indicating that Price, who was then over 70 years old, was no longer engaged in the practice of law. Other evidence indicated that, after Price surrendered his law license in 1996, he had been convicted and incarcerated for crimes unrelated to these actions; there were unsatisfied judgments still pending against him; his estate had a negative net worth; he had paid his assets into court to satisfy outstanding claims unrelated to the plaintiffs' actions; he was employed by a non-profit organization in a low-paying position; his liability insurer had attempted to rescind any malpractice coverage related the plaintiffs' claims; and, even if his insurer's rescission action failed, his malpractice coverage had been depleted to approximately $141,000.
[16] The plaintiffs argue that the trial court erred in ordering the remittitur because, they argue, all theHammond factors other than Price's financial condition supported the punitive-damages award. They also contend that, in evaluating Price's ability to pay punitive damages, the trial court should have considered that the initial amount of Price's malpractice liability coverage was $1 million before the insurer invested in Price's defense, that the plaintiffs had offered to settle within the limits of Price's malpractice coverage, and that Price had a potential bad-faith claim against his insurer for its failure to settle these claims.
[17] The Legal Services Liability Act is codified at §6-5-570 et seq., Ala. Code 1975. Price was a legal-service provider pursuant to § 6-5-572(2). Section 6-5-572(1) states that a legal-service-liability action is one in which the "injury or damage was caused in whole or part by the legal service provider's violation of the standard of care," and that such an action embraces "all claims for injuries or damage or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission," and "any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery. . . ."
[18] In Ex parte Panell, 756 So.2d 862 (Ala. 1999), a plurality decision, the lead opinion stated thatMichael had misconstrued § 6-5-574 and that a legal-service-liability action arises at the time of the act or omission giving rise to the claim, not at the time an injury is sustained. 756 So.2d at 869. According to that nonbinding opinion, the "act or omission principle" in Panell
applies only to actions brought after its release.
[19] Ragland also retained Price to probate Tully's estate after Tully's death in 1991. The plaintiffs do not contend that Price's work in that regard was deficient.
[20] The record is devoid of evidence indicating that Price had dealt with or communicated to the children's trust about the IRS dispute before his November 22, 1994, letter.
[21] The plaintiffs did not, however, present evidence indicating that those salaries were excessive in view of the scope of TBC's business, the risks attendant to its operation in the mid-1990s, or the work performed by Buddy.
[22] TBC paid its first dividend to Buddy in 1988. In 1987, TBC paid Buddy a salary as president that exceeded the highest annual salary previously paid to Tully.
[23] In Price's confidential April 11, 1995, legal memorandum to Ragland, Price analyzed Buddy's potential liability to the plaintiffs:
 "Unlike an arm's-length transaction, the buyer/seller cannot argue that [the stock redemption] was freely bargained for and thereby shield himself from liability. A purchase of stock at a price that is later determined to be inadequate, when sold by the attorney-in-fact for the seller, would therefore appear to be voidable."
[24] For purposes of this appeal, we assume that the trust was unaware of the rescission option until 1996, the year it filed its action. On November 22, 1994, Price advised Buddy, the purported trustee, of his fiduciary obligations to the beneficiaries of the children's trust. However, the record contains evidence indicating that Price knew that the power of attorney Tully had given to Buddy did not authorize Buddy to act as the trustee of the children's trust. When that evidence is viewed in the light most favorable to the plaintiffs, Price's communication to an unauthorized trustee was not an effective means to advise the children's trust of its rights.
[25] The litigation damages were a type of different-course damages. The litigation damages were not based on an employment contract, or other agreement under which Price agreed to pay litigation-related expenses if he violated his duties. The record does not indicate that the plaintiffs quantified the litigation damages, or that they showed by substantial evidence that the litigation they brought against TBC, Buddy, and other defendants in November 1996 would not have transpired had Price not committed malpractice in his work on the IRS dispute.
[26] Our holding also pretermits consideration of Price's arguments for a new trial on the grounds (1) that the trial court erroneously charged the jury concerning the time period over which compensatory damages could be awarded, or (2) that the trial court should have instructed the jury to set off the approximate $6 million received by the plaintiffs in settlements from other defendants against any compensatory-damages award against Price, or itself should have reduced that award to "$0" because of those settlements. *Page 266