SELLERS, Justice.
William T. Barrett ("Bill") appeals an order of the Elmore Circuit Court entering a summary judgment in favor of George Harvey Barrett ("George") and the trustees of the George Harvey Barrett Trust--Gail Ledbetter Cole Kaphan, Curtis L. Barrett, Jr., and Charles F. Ledbetter (hereinafter referred to collectively as "the trustees"). He also challenges the denial of his motion for a partial summary judgment on the basis that the circuit court lacked *271 the authority to modify the trust. We reverse and remand.
I. Facts and Procedural History
In 1999, Ben H. Barrett and Janet Ledbetter Barrett died in a plane crash. The Barretts' wills, the applicable provisions of which were identical, established the "Children's Trust" for the benefit of George and his two younger siblings and provided that each child would receive his or her portion of the trust proceeds upon reaching age 25 and that the trust would terminate when the youngest child reached age 25. In June 2000, the Elmore Circuit Court, on the petition of the trustees, modified the Children's Trust to establish separate trusts for each Barrett child and to provide that the trustees
"are required to pay 40% of the trust assets to each Barrett child upon his or her attainment of 25 years of age and the remaining 60% of said trust assets upon the attainment of 35, at which time said Trust shall terminate."
This appeal involves the George Harvey Barrett Trust ("the trust"), which consists largely of 10,000 shares of Central Alabama Bancshares, Inc., bank stock ("the bank stock"). Central Alabama Bancshares, Inc., is the holding company of First Community Bank ("the bank"). In August 2014, George offered to sell the bank stock to his cousin Bill because the trustees refused to give him enough money from the trust to meet his financial needs.[1] The agreement between Bill and George, dated August 22, 2014, and prepared by Bill's attorney ("the Agreement"), states that Bill agrees to pay George $50,000 upon the execution of the Agreement; $50,000 upon delivery of the bank stock to Bill, plus 7% interest per annum; and all dividends paid on the bank stock from the date of the Agreement until the date the bank stock is delivered to Bill.[2] The Agreement further states, among other things, that Bill and George have made the decision "at this time" not to inform the trustees about the existence of the Agreement.
Almost a year later, on August 5, 2015, George was involved in an automobile accident, which caused him to suffer "significant cognitive and behavioral deficits" for which he received inpatient rehabilitation and behavioral-management therapy at the Restore Neurobehavioral Center in Roswell, Georgia ("Restore").
On October 26, 2015, while George was a patient at Restore, Bill's attorney wrote a letter to Curtis L. Barrett, Jr., one of the trustees of the trust, attaching a copy of the Agreement, informing Curtis that George would be turning 35 on November 7, 2015, and requesting that the trustees transfer either to Bill or to George the bank stock and all dividends that had been paid on the stock since August 22, 2014. The trustees informed Bill that they would *272 not turn over the bank stock to him absent a court order.
On January 4, 2016, George was discharged from Restore and returned to his home on Lake Jordan. Restore's discharge instructions stated that, because of "[George's] impairments in memory, attention, organization and planning post-injury, it is recommended that [he] have a conservator."[3]
On January 8, 2016, the trustees filed a petition in the Elmore Circuit Court seeking to modify the trust and asserting, among other things, that George was unable to manage his financial affairs, that a guardian ad litem should be appointed to represent George in the trust-modification proceeding, and that the trustees should be allowed to continue to maintain the assets in trust for George's benefit. The trustees further requested that the circuit court enter a temporary restraining order against George pursuant to Rule 65(b), Ala. R. Civ. P., prohibiting him from demanding that the trustees terminate the trust and/or distribute to him the remaining assets of the trust. The trustees did not name Bill as a necessary party to the trust-modification proceeding despite knowing that he had a claim against the trust assets. The circuit court thereafter issued a temporary restraining order against George and appointed a guardian ad litem to represent him in the trust-modification proceeding.
On May 9, 2016, the circuit court, following a hearing, entered an order, pursuant to § 19-3B-412, Ala. Code 1975, modifying the trust to extend its term indefinitely pending further order of the court. The circuit court also released George's guardian ad litem. After learning that the trust had been modified, Bill filed a complaint in intervention asserting that he was a necessary and indispensable party to the trust-modification proceeding, asserting that the order extending the term of the trust was void, and seeking enforcement of the Agreement between him and George. The trustees thereafter moved the circuit court to appoint a guardian ad litem for George in connection with Bill's complaint in intervention. The circuit court denied that motion, and George hired an attorney to represent him.
In February 2017, the trustees filed a motion for a summary judgment, asserting that the Agreement between Bill and George was, as a matter of law, void ab initio because, they argued, the Agreement violated the transfer restrictions of the bank's shareholders agreement. George thereafter joined in the trustees' motion for a summary judgment, adopting their argument. Bill subsequently amended his complaint in intervention to assert that George had breached the Agreement by failing to deliver the bank stock and the accrued dividends; that the circuit court lacked jurisdiction to extend the trust because the trust had terminated by its express terms; that the extension of the trust after Bill had asserted a claim to the bank stock constituted a fraudulent transfer; and that Bill was entitled to attach the trust assets pursuant to § 19-3B-501, Ala. Code 1975. Bill thereafter filed a motion for a partial summary judgment based on his claim that the circuit court lacked the authority to modify the trust after it had terminated by its own terms.
On November 2, 2017, the circuit court entered an order, (1) entering a summary judgment for the trustees and George on the basis that the Agreement between Bill and George, upon which Bill had based all of his claims, was void ab initio because it *273 violated the transfer restrictions of the bank's shareholders agreement, (2) ordering George to reimburse Bill "the sum of $50,000 plus interest at the rate of 6% per annum from the date the said $50,000.00 was actually delivered to [George]," and (3) denying Bill's motion for a partial summary judgment as moot. Bill filed a postjudgment motion, which was denied. This appeal followed. The dispositive issues presented in this appeal are whether the circuit court erred in denying Bill's motion for a partial summary judgment on the basis that the circuit court lacked the authority to modify the trust and whether the circuit court erred in entering a summary judgment in favor of George and the trustees on the basis that the Agreement is void ab initio because it violates the transfer restrictions of the bank's shareholders agreement.
II. Standard of Review
In reviewing the disposition of a motion for a summary judgment, this Court uses the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc., 850 So.2d 259 (Ala. 2002).
III. Discussion
A. Modification of the Trust
Bill argues that he was entitled to a partial summary judgment on the basis that the circuit court lacked the authority to modify the trust because, he says, the trust had already terminated by its own terms on November 7, 2015, when George turned 35. We agree. The circuit court purportedly modified the trust pursuant to § 19-3B-412, which provides, in relevant part:
"(a) The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust. To the extent practicable, the modification must be made in accordance with the settlor's probable intention.
"(b) The court may modify the administrative terms of a trust if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration."
Section 19-3B-412 is limited in scope to the modification and termination of active trusts; nothing in the language of the statute suggests that a trial court has the authority to extend and/or revive a trust that terminated by its own terms. "If by the terms of the trust the trust is to continue only until the expiration of a certain period or until the happening of a certain event, the trust will be terminated upon the expiration of the period or the happening of the event." Restatement (Second) of Trusts § 334 (1959). In this case, the circuit court's June 2000 order extending the trust until George reached the age of 35 unambiguously provides that the trustees
"are required to pay 40% of the trust assets to [George] upon his ... attainment of 25 years of age and the remaining 60% of said trust assets upon the attainment of 35, at which time said Trust shall terminate."
(Emphasis added.) As a matter of law, the trust terminated by its own terms on November 7, 2015, when George turned age 35. The trustees filed their petition to modify the trust on January 8, 2016--two months after the trust had terminated. After the trust terminated on November 7, 2015, the trustees had a duty to distribute the trust assets either to George or to his conservator had one been appointed and to *274 wind up the affairs of the trust. See 19-3B-817(b), Ala. Code 1975 (providing that, "[u]pon the occurrence of an event terminating ... a trust, the trustee shall proceed expeditiously to distribute the trust property to the persons entitled to it, subject to the right of the trustee to retain a reasonable reserve for the payment of debts, expenses, and taxes"). See also Ex parte Williams, 87 Ala. 547, 551, 6 So. 314, 316 (1889) (explaining that "[t]he extinguishment of the trust terminated [the trustee's] further power of control, except to take proper care of any trust fund or property in his possession, and to account to the Chancery Court. [The trustee] had no further power to collect rents, or to sue for possession of the property of the decedent").
Accordingly, when the trust terminated by its own terms, the circuit court had no legal basis under § 19-3B-412 on which to modify and/or to revive the trust to extend the vesting provisions indefinitely. Further, because the trust terminated when George turned 35, the trustees lacked the authority to take any additional action in defending against the claims asserted by Bill, much less to act as plaintiffs in their capacities as trustees. Accordingly, because the circuit court lacked the authority to modify the trust after it had terminated, the circuit court erred in denying Bill's motion for a partial summary judgment. Insofar as the summary judgment purports to grant relief for the trustees, it is vacated. Because George had standing to join in the action based on his interest in the bank stock owned by the trust, we now address whether the circuit court erred in entering a summary judgment in favor of George on the basis that the Agreement was void ab initio.
B. The Agreement
As indicated, Bill intervened in the trust-modification proceeding seeking to enforce the Agreement. Bill amended his complaint in intervention to add claims of, among other things, breach of the Agreement. The Agreement states, in relevant part:
"4. The parties intend for this Agreement and the transfer of the stock to be in full compliance with all rules, regulations, and laws governing the transfer of stock including but not limited to that certain Shareholders Agreement between the [bank] and its shareholders, governing the transfer of said stocks. However, in the event said transfer fails to meet the requirements of some rule, regulation, or law or the Shareholder Agreement, [George] agrees to sign any and all documents that may now or in the future be necessary or become necessary in order to properly and legally transfer said stock.
"....
"6. Upon [George] receiving the stock, he shall immediately notify [Bill] of his possession of the stock and on the same day shall arrange to meet with [Bill] to deliver the stock and stock certificates to [Bill]. [George] shall at that time sign the stock transfer agreement on the back of the stock certificate and do all other things that might be necessary or desirable to cause legal title to the stock to be transferred to [Bill].
"....
"11. In the event that the trustees fail to timely deliver the stock to [George], [George] agrees, at his sole expense, to do all things necessary, including but not limited to the filing of a lawsuit, to cause said stock to be delivered to him.
"12. In the event either party to this [Agreement] breaches this [Agreement] or fails to comply with all of its provisions, the other party shall be entitled to sue for and recover all attorney fees and *275 cost, all damages provided for by law or equity, and specific performance."
Under the terms of the Agreement, George agreed to do everything necessary to legally transfer the bank stock to Bill, including bringing an action against the trustees to compel delivery of the bank stock. George further obligated himself under the Agreement to pay damages provided for by law and equity in the event he breached the Agreement. In his motion for a summary judgment, however, George took the position that Bill lacked standing to assert any claims under the Agreement because, he argued, the Agreement was, as a matter of law, void ab initio because it violated the transfer restrictions of the bank's shareholders agreement. George relied on the prefatory language of the shareholders agreement, which states:
"No shareholder may sell, assign, transfer, pledge, hypothecate, mortgage, encumber, or otherwise dispose of any Shares, whether voluntarily, involuntarily or by operation of law (collectively, a 'Disposition') except as expressly provided in this Agreement. Any attempted Disposition of Shares that is not in accordance with the terms of this Agreement shall be void ab initio and will not be reflected in the Company's records."
(Emphasis added.) The shareholders agreement provides that a shareholder may transfer his or her stock:
"(i) to one or more members of a class consisting of a Shareholder's spouse, former spouse, lineal ancestors or descendants, bothers, sisters, children and grandchildren (or a qualifying trust for the benefit of any one or more of such class); or
"(ii) to another shareholder; or
"(iii) which is approved by the affirmative vote of 66-2/3% of the directors of the Company then holding office."
George specifically argued in his motion for a summary judgment that the sale of the bank stock to Bill was not a permitted transfer because, he said, Bill is not a lineal ancestor or descendant of George's, but a cousin; Bill is not a shareholder of the bank; and the board of directors of the bank were not asked to and, therefore, did not approve the attempted sale of stock to Bill. Bill, on the other hand, argued that the term "lineal ancestor or descendant" is ambiguous and that a genuine issue of material fact exists as to whether the board of directors will approve the sale of the bank stock or whether the time for doing so has passed. Even assuming that the sale of the bank stock to Bill is not a permitted transfer under the shareholders agreement, we conclude that the circuit court erred in finding, as a matter of law, that the Agreement between Bill and George was void ab initio, thereby precluding Bill from enforcing his rights under the Agreement. The shareholders agreement unambiguously states that "[a]ny attempted disposition of Shares that is not in accordance with the terms of this Agreement shall be void ab initio and will not be reflected in the Company's records." In other words, assuming the sale of the bank stock in this case is void ab initio, then the bank may refuse to issue or register the bank stock in Bill's name. It stands to reason that Bill is not precluded from enforcing his rights under the Agreement, especially for damages resulting from any breach of the Agreement. There is simply nothing in the language of the shareholders agreement that purports to void a private contract a shareholder executes with a third party in which the shareholder agrees to sell his or her bank stock to that third party. The circuit court's interpretation of the shareholders agreement does not comport with the plain language of the shareholders agreement and, in fact, dictates an inequitable result. Simply put, *276 George should not be allowed to induce Bill to buy the bank stock on the basis that the trustees failed to provide him with enough money from the trust to meet his financial needs and then claim the benefit of the transfer restrictions of the shareholders agreement to void the Agreement. See Southern Energy Homes, Inc. v. Ard, 772 So.2d 1131, 1134 (Ala. 2000) ("A [party] cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions."). Based on the foregoing, the circuit court erred in entering a summary judgment in favor of George.
IV. Conclusion
Insofar as the summary judgment was in favor of the trustees, it is vacated; the summary judgment in favor of George based on the circuit court's holding that the Agreement was void ab initio is reversed; and the cause is remanded to the circuit court for further proceedings consistent with this opinion.
VACATED IN PART; REVERSED IN PART; AND REMANDED.
Stuart, C.J., and Bolin, Parker, Main, Wise, and Mendheim, JJ., concur.
Shaw and Bryan, JJ., concur in the result in part and dissent in part.
SHAW, Justice (concurring in the result in part and dissenting in part).
I do not believe that the resolution in the main opinion of the issues addressed in Part III.B. allow the ruling in Part III.A.; therefore, I dissent in part.
This case involves two broad issues. The first relates to an agreement dated August 22, 2014 ("the Agreement"), in which George Harvey Barrett purported to sell to his cousin, William T. Barrett ("Bill"), certain shares of bank stock ("the bank stock"). The issue on appeal is whether, on two separate grounds, this Agreement is unenforceable.
The second issue involves a modification to a trust in which George was the beneficiary. That trust held the bank stock George purported to sell in the Agreement. As the main opinion explains, the trustees petitioned the circuit court to modify the trust to, among other things, extend its duration. This relief seems clearly improper, because the trust had already terminated by its terms. However, as explained below, if the transfer of the bank stock cannot be enforced under the Agreement, Bill cannot challenge the modification of the trust.
I. The Agreement
As noted above, the Agreement involved the sale by George to Bill of certain bank stock. The bank's shareholders agreement, however, provided that the bank stock could be transferred to only certain categories of family members, and Bill was not included in any of those categories. Specifically, section 1(a) of the shareholders agreement forbids the transfer or sale of shares of stock except as is explicitly provided:
"No Shareholder may sell ... or otherwise dispose of any Shares ... (collectively, a 'Disposition') except as expressly provided in this [shareholders agreement]. Any attempted Disposition of Shares that is not in accordance with the terms of this [shareholders agreement] shall be void ab initio and will not be reflected in the Company's records."
Section 1(b) of the shareholders agreement describes what transfers or dispositions of stock are permitted; section 1(b)(i), which is at issue in this case, describes one such permitted disposition as follows:
"[T]o one or more members of a class consisting of a Shareholder's spouse, former spouse, lineal ancestors or descendants, brothers, sisters, children and *277 grandchildren (or a qualifying trust for the benefit of any one or more of such class)...."
(Emphasis added.)
It is argued on appeal that, under the above terms of the shareholders agreement, the sale of the bank stock to Bill is not permitted.[4] The main opinion pretermits addressing this issue. However, I believe that we must address it because, if Bill is not entitled to the bank stock,[5] then he cannot challenge the modification of the trust, and the circuit court's judgment in that regard must be affirmed.
II. The Trust Modification
If Bill cannot obtain the bank stock held by the trust, and has no other claim to the corpus of the trust, then he has no interest in the modification of the trust. As explained below, because his legal rights would not be impacted by its modification, he would have no basis in the circuit court on which to challenge that modification and no right to appeal that court's decision. Thus, the circuit court's ruling on that issue, which the main opinion vacates, would not properly be before this Court on appeal.
In the circuit court, it was argued that Bill lacked "standing" to challenge the circuit court's modification of the trust. The trustees contend on appeal that Bill suffered no cognizable injury to a legally protected right that would entitle him to sue. They cite cases involving the issue of standing and explaining that, to be a proper party to a suit, one must have a real, tangible legal interest in the subject matter of that suit and have an injury in fact to a legally protected right. Town of Cedar Bluff v. Citizens Caring for Children, 904 So.2d 1253, 1256-57 (Ala. 2004), and Moore v. John Hancock Life Ins. Co., 876 So.2d 443, 448 (Ala. 2003).
In Ex parte Synovus Trust Co., 41 So.3d 70 (Ala. 2009), certain beneficiaries of a trust sued the trustees alleging breach of fiduciary duty. This Court held, however, that the law provided that such duties were owed "exclusively" to other parties and not to the beneficiaries in that case. Ex parte Synovus Trust, 41 So.3d at 74. Thus, the beneficiaries' action did "not seek redress for legally protected rights, and the [beneficiaries] have no standing to assert those claims." Id.
Although the decision in Ex parte Synovus Trust speaks in terms of "standing," it is clear that the principle of standing does not apply in either that case or the one before us. As this Court has recently strived to clarify, the doctrine of standing generally has no applicability in private-law cases. Ex parte Wilcox Cty. Bd. of Educ., 218 So.3d 774, 780 n.7 (Ala. 2016). Instead of a matter of "standing," the issue in Ex parte Synovus Trust was whether there was a "failure to state a cognizable cause of action or legal theory, or a failure to satisfy the injury element of a cause of action,"
*278 Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama, 42 So.3d 1216, 1219 (Ala. 2010), which is often confused with standing. That same analysis applies in the instant case.
In Ex parte Synovus Trust, the beneficiaries were simply unable, as a matter of law, to prove an injury to a legally protected right; thus, their cause of action against the trustees failed. As noted by the trustees in their brief in the instant case, Bill's challenge to the modification of the trust arises exclusively from the Agreement to purchase the bank stock held by the trust. But if the transfer of the bank stock cannot occur--George cannot perform his end of the bargain and sell the bank stock because he had no ability to transfer the stock to one who was not permitted to receive it--Bill has no claim against the trust or its corpus. Thus, the modification would not have injured his legally protected rights, and there is no provable injury suffered by Bill necessary to state a claim challenging that modification. Although both the trustees and the Court in Ex parte Synovus Trust, we now recognize, misuse the term "standing," the actual legal principle at issue--the lack of an injury--operates the same way and would require affirmance of the trial court's decision on the modification issue.
I believe that we must address this issue before vacating the circuit court's judgment modifying the trust; therefore, I dissent as to Part III.A. of the main opinion vacating the circuit court's modification of the trust.
III. Bill's Breach-of-Contract Claim
Whether the Agreement was made "void ab initio" by the shareholders agreement is a different issue. The trustees moved for a summary judgment, arguing that section 1(a) of the shareholders agreement, quoted above, rendered the Agreement to sell the bank stock "void"; thus, the trustees argued, Bill's breach-of-contract claim failed as a matter of law. The circuit court granted this motion.
I agree with the main opinion's conclusion that the Agreement was not rendered "void" by the separate shareholders agreement and that Bill can pursue a breach-of-contract claim.[6] I express no opinion as to the merits of such a claim, but to the extent the main opinion allows such, I concur in the result.
Bryan, J., concurs.

The bank's shareholders agreement provides that, if any shares of bank stock are held in trust, the trustees of that trust are to distribute all income of the trust on an annual basis; the trustees concede in their brief that they exercised their discretion through the years to not distribute all the income of the trust to George. According to Bill, from 2010 through 2014, George routinely asked him for money to pay his living expenses, and he gave George money on a regular basis. During that same time, George had offered to sell the bank stock to Bill on about 10 different occasions, and Bill declined the offers each time. Bill finally agreed to buy the bank stock because George needed the money; he was facing jail time if he did not pay certain fines and court costs and was in financial straits.

At the time the Agreement was executed on August 22, 2014, the appraised value of the bank stock was $43.50 a share. Additionally, between August 22, 2014, and November 7, 2015, the date George turned 35, $61,750 in dividends were paid on the stock.

It does not appear from the record that the trustees, George's guardian ad litem, or any attorney petitioned a court to impose a conservatorship.

Bill claims that the phrase "lineal ancestors or descendants" is ambiguous and that, under his interpretation of the phrase, the transfer of the bank stock to him as a cousin of George's is permitted. I disagree. Without engaging in an extensive discussion of this issue, it is sufficient to state that one's cousin is not a "lineal" ancestor or descendant of that person. Bill did not otherwise meet any of the categories of persons to whom the shareholders agreement would allow a transfer or purchase of the bank stock. Bill has other arguments challenging the shareholders agreement and the application of the transfer restriction, but those arguments have been pretermitted.

The language in the restriction would appear to be enforceable. See § 10A-2-6.27(b), Ala. Code 1975 ("A restriction on the transfer or registration of transfer of shares is valid and enforceable against the holder or a transferee of the holder ....").

I disagree that the relief provided by the circuit court was inequitable. It ordered the money Bill paid to George to be returned with interest, making Bill whole. The main opinion cites the principle that a party may not simultaneously claim the benefits of a contract and repudiate the burdens and conditions of that same contract, but that is not what is occurring here. The burdens imposed by the shareholders agreement were applied equally: George was not allowed to sell the bank stock, and Bill was not allowed to receive it. Further, neither party was allowed to accept the benefits of the separate Agreement to sell the bank stock, and the circuit court ordered that Bill's money be returned, making him whole. Simply put, George gained no benefit from the Agreement, and Bill lost nothing, except ownership of the stock.